# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 8, 2008      Decided December 30, 2008

No. 07-5065

RUSSELL KAEMMERLING,
APPELLANT

v.

HARLEY G. LAPPIN, DIRECTOR, FEDERAL BUREAU OF PRISONS
AND MICHAEL B. MUKASEY,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 06cv01389)

---

*Jeff Kosseff*, Student Counsel, argued the cause as *amicus curiae* in support of petitioner. With him on the briefs were *Steven H. Goldblatt*, appointed by the court, and *Cecily E. Baskir*, *Damon C. Elder*, and *Elizabeth A. Rose*, Student Counsel.

*Russell Kaemmerling*, pro se, was on the brief for appellant.

*Oliver W. McDaniel*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence* and *Michael J. Ryan*, Assistant U.S. Attorneys.

Before: SENTELLE, *Chief Judge*, and HENDERSON and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Russell Kaemmerling, a federal prisoner, appeals from the district court's dismissal of his action seeking to enjoin application of the DNA Analysis Backlog Elimination Act of 2000 ("DNA Act" or "the Act"), 42 U.S.C. §§ 14135–14135e. Kaemmerling alleged that the Act violated his rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb-4, and the First, Fourth, and Fifth Amendments of the United States Constitution. The district court denied his request for a preliminary injunction and then dismissed the action for his failure to exhaust administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. Although we conclude that the PLRA does not require Kaemmerling to exhaust administrative remedies on his challenge to the DNA Act, we nevertheless affirm the dismissal of the case because his complaint fails to state a claim.

I

Pursuant to congressional authorization, the Federal Bureau of Investigation ("FBI") established the Combined DNA Index System ("CODIS"), a national database containing electronic DNA profiles of convicted offenders from the state and federal systems, evidence from crime scenes, and unidentified human remains that allows government officials to match an electronic DNA profile to its donor's identity for "law enforcement identification purposes," "judicial proceedings," and "criminal defense purposes." 42 U.S.C. § 14132(a), (b)(3). Law enforcement officers use the CODIS to match one forensic crime scene sample to another, thereby connecting unsolved

crimes through a common perpetrator, and to match evidence from the scene of a crime to a particular offender's profile, thereby solving crimes committed by known offenders. *See United States v. Kincade*, 379 F.3d 813, 819 (9th Cir. 2004). Unauthorized uses or disclosures of DNA information stored in the database are punishable by fines and imprisonment. 42 U.S.C. § 14133(c).

To facilitate the efficacy of the CODIS, the DNA Act directs the Federal Bureau of Prisons ("BOP") to collect "a tissue, fluid, or other bodily sample . . . on which a[n] . . . analysis of the deoxyribonucleic acid (DNA) identification information" can be carried out, *id.* § 14135a(c), from "each individual in the custody of the [BOP] who is, or has been, convicted of a qualifying Federal offense," which includes all felonies, sexual abuse, and crimes of violence, *id.* § 14135a(a)(1)(B), (d). Failure to cooperate in the collection of a sample is a misdemeanor offense. *Id.* § 14135a(a)(5). The BOP turns an offender's sample over to the FBI, where an analyst extracts the DNA from cells in the sample and then uses short tandem repeat ("STR") technology to identify non-genic variants known as alleles at thirteen specific loci on the DNA. *See Banks v. United States*, 490 F.3d 1178, 1180 (10th Cir. 2007); *Kincade*, 379 F.3d at 818. After creating the donor's unique DNA profile, the FBI then records a copy of the profile in the CODIS. *See Johnson v. Quander*, 440 F.3d 489, 498 (D.C. Cir. 2006).

Kaemmerling was convicted of conspiring to commit wire fraud, a felony offense, and is currently incarcerated at the Federal Correctional Institution in Seagoville, Texas. Because he has committed a qualifying offense, the DNA Act requires the BOP to take a fluid or tissue sample from Kaemmerling for DNA analysis and inclusion in the CODIS. In August 2006, Kaemmerling brought suit against the Director of the BOP and

the Attorney General, seeking a declaratory judgment and injunctive relief against enforcement of the DNA Act. He alleged that, as an "Evangelical Christian," submitting to DNA "sampling, collection and storage with no clear limitations of use" is repugnant to his strongly held religious beliefs about the proper use of "the building blocks of life." According to his religious beliefs, the collection and retention of his DNA information is "tantamount to laying the foundation for the rise of the anti-Christ." Kaemmerling protested that enforcing the DNA Act against him would violate his rights under the RFRA and the First Amendment, as well as under the Fourth and Fifth Amendments.

Four other plaintiffs joined Kaemmerling in his suit and filed, along with their joint complaint, a motion for class certification and a motion for a temporary restraining order and preliminary injunction to prevent the BOP from collecting their DNA samples while the action was pending. The district court denied the plaintiffs' motion for a temporary restraining order and a preliminary injunction, discerning no imminent irreparable injury.

The district court subsequently dismissed the case without prejudice for failure to exhaust administrative remedies under the PLRA. The plaintiffs objected that the BOP "lacks any authority to provide any relief or take any action whatsoever" in response to their challenges to the DNA Act, leaving them with no administrative remedy to exhaust. The district court disagreed, concluding that the plaintiffs must comply with PLRA procedures even if pursuing administrative remedies might be futile, because collection of their DNA samples is a prison circumstance or occurrence. In its final order, the court denied all other pending motions as moot, including the motion for class certification.

Kaemmerling timely appealed the dismissal, and we dismissed the plaintiffs' earlier interlocutory appeal from denial of the motion for a temporary restraining order. Although all five plaintiffs pursued the interlocutory appeal, only Kaemmerling seeks review in the present proceeding. *See* December 28, 2007 Order, Case No. 07-5065 (denying plaintiff Daniel Siler's motion for injunction because he "failed to note an appeal in this action"). On appeal, Kaemmerling argues that the district court erred in dismissing his case because the PLRA's exhaustion requirement does not apply and that it erred in denying his motion for a preliminary injunction. The BOP defends the district court's PLRA decision and further argues that, even if Kaemmerling is not required to exhaust administrative remedies, we should dismiss his complaint for failure to state a claim.

II

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement affords prison officials time and opportunity to resolve complaints concerning the exercise of their responsibilities before allowing the initiation of a federal case. Exhaustion thus "has the potential to reduce the number of inmate suits" by resolving problems at the administrative level and "to improve the quality of suits that are filed by producing a useful administrative record." *Jones v. Bock*, 549 U.S. 199 (2007); *see Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).

Exhaustion is the "general rule" for litigation within Section 1997e(a)'s compass. *Porter*, 534 U.S. at 525 n.4.[1] Even if an inmate believes that seeking administrative relief from the prison would be futile and even if the grievance system cannot offer the particular form of relief sought, the prisoner nevertheless must exhaust the available administrative process. *Booth v. Churner*, 532 U.S. 731, 739, 741 & n.6 (2001). But a prisoner must exhaust only "such administrative remedies as are available," 42 U.S.C. § 1997e(a), that is, those prison grievance procedures that provide "the possibility of some relief for the action complained of," *Booth*, 532 U.S. at 738. The statutory requirement of an available remedy presupposes authority to take some action in response to a complaint. *Booth*, 532 U.S. at 736. Thus, if "the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint," then a prisoner is left with nothing to exhaust and the PLRA does not prevent the prisoner from bringing his or her claim directly to the district court. *Id.*; *see Larkin v. Galloway*, 266 F.3d 718, 723 (7th Cir. 2001) (prisoner must exhaust any prison administrative process that "was empowered to consider his complaint and . . . could take *some* action in response to it"); *Snider v. Melindez*, 199 F.3d 108, 113 n.2 (2d Cir. 1999) ("If . . . the inmate's suit complains that he was beaten by prison guards, and the institution provides a grievance proceeding for inmate complaints about food . . . but none for complaints about beatings," the inmate would not be required to pursue the grievance procedure having "no application whatsoever to the subject matter of his complaint.").

This case is the rare one in which there is no administrative process to exhaust because the BOP lacks authority to provide

---

[1] Footnote 4 of *Porter* makes it plain that the exhaustion requirement of § 1997e(a) is quite encompassing enough to include the litigation at bar.

Kaemmerling any relief or to take any action whatsoever in response to his complaint challenging enforcement of the DNA Act. The BOP has no discretion not to collect Kaemmerling's DNA, as the statute's mandatory language indicates and as the BOP conceded at oral argument. *See* 42 U.S.C. § 14135a(a)(1)(B) ("[t]he Director of the [BOP] shall collect a DNA sample from each individual" in BOP custody who has been convicted of a qualifying offense), (b) ("the Director of the Bureau of Prisons . . . shall furnish each DNA sample collected . . . to the [FBI], who shall carry out a DNA analysis"); *see also United States v. Carmichael*, 343 F.3d 756, 761 (5th Cir. 2003) (the BOP "flouts the multiple layers of legal obligations placed upon it" if it does not collect a DNA sample from felons while in custody). Even under questioning from this court, counsel for the BOP could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to Kaemmerling's claim that collecting his DNA would violate his statutory and constitutional rights. The BOP has failed to carry its burden of showing an administrative remedy available for Kaemmerling to exhaust. *See Jones*, 549 U.S. at 215-16 (failure to exhaust is an affirmative defense under the PLRA).

This is not a situation like that in *Booth*, where the prison grievance process cannot grant the exact type of relief the inmate seeks or where the inmate believes pursuing the process would be futile because it is unlikely to resolve his complaint. Although the administrative process in *Booth* could not offer money damages—the exclusive form of redress the inmate sought—it did authorize at least some responsive action on the inmate's complaint of abuse, such as reassigning the abusive guard. *See Booth*, 532 U.S. at 735-36. Here, the prison grievance process cannot authorize any action on the subject of Kaemmerling's complaint because he challenges the statute's command that BOP collect his DNA sample. Kaemmerling

does not complain about the method or timing of collecting the sample, which counsel for the BOP suggested the prison might have authority to change; he complains only about the fact that the BOP will collect his DNA at all, a complaint for which the BOP can offer no possible relief.

Requiring an inmate to exhaust an administrative grievance process that cannot address the subject of his or her complaint would serve none of the purposes of exhaustion of administrative remedies. When the BOP cannot take any action at all in response to a complaint, it has nothing to offer that could possibly satisfy the prisoner and obviate the need for litigation. *See Porter*, 534 U.S. at 525. Requiring exhaustion when no relief is available "is more likely to inflame than to mollify passions, and thus is unlikely to 'filter out some frivolous claims.'" *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005) (quoting *Porter*, 534 U.S. at 525) (first quotation omitted). And prison administrators are unlikely to spend resources developing an administrative record when that process cannot possibly lead to relief, nor would there be much record to develop when the prisoner is challenging, as here, the enforceability of a statute rather than the prison's method of enforcement. *See Porter*, 534 U.S. at 525; *Brown*, 422 F.3d at 936. Finally, requiring exhaustion in these circumstances is not necessary for protection of administrative agency authority from judicial interference, because no administrative program or mistake is at issue, nor can an administrative solution resolve the complaint.[2] *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006).

---

[2]We reject the suggestion of the BOP that our holding conflicts with *United States v. Carmichael*, 343 F.3d 756 (5th Cir. 2003). There, the Fifth Circuit decided that the collection of a federal offender's DNA sample during incarceration was not part of the offender's sentence, subject to challenge on direct appeal, but instead was a prison condition that must be challenged through a separate civil

III

We now turn to the BOP's alternative ground for dismissal, that the complaint fails to state a claim upon which relief can be granted. The BOP raised this alternative basis for dismissal in the district court, and both parties have fully briefed the merits of the issue before us. We consider the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6) *de novo*; therefore, we may independently assess the complaint and need not remand at this stage for the district court to evaluate its sufficiency in the first instance. *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994); *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). Dismissal of Kaemmerling's *pro se* complaint at this stage is proper only "if, after construing the complaint liberally in [Kaemmerling's] favor and granting [him] the benefit of all reasonable inferences to be derived from the facts alleged, he could prove no set of facts in support of his claim that would entitle him to relief." *Henthorn*, 29 F.3d at 684. Even given the special liberality with which we consider *pro se* complaints, we need not accept inferences unsupported by the facts alleged in the complaint or "legal conclusions cast in the form of factual allegations." *Id.* (quotation omitted). Kaemmerling's complaint alleges violations of his rights under the RFRA and the First, Fourth, and Fifth Amendments. After thoroughly considering each of these challenges, we conclude that none of them state a claim upon which relief can be granted.

---

action in accordance with the strictures of the PLRA. *See id.* at 761. The court had no occasion to consider, and did not consider, the availability of administrative remedies on Carmichael's challenge to the collection of his DNA sample pursuant to the DNA Act. *See id.* at 759-61.

10

A

We begin with Kaemmerling's religious claim, which fails to allege a violation of the Free Exercise Clause. Kaemmerling contends that mandatory collection and analysis of his DNA under the DNA Act burdens the free exercise of his religious belief that "DNA sampling, collection and storage" "defile[s] God's temple." Even assuming this is true, it does not rise to the level of a constitutional violation. The right of free exercise protected by the First Amendment "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990) (quotation omitted). Kaemmerling does not suggest that the DNA Act is not, in theory or practice, a religion-neutral, generally applicable law, therefore he alleges no Free Exercise violation, even if the Act incidentally affects religiously motivated action. *See id.* at 878-81; *Shaffer v. Saffle*, 148 F.3d 1180, 1181-82 (10th Cir. 1998) (holding plaintiff failed to state a claim for denial of First Amendment rights when he did not contend that the DNA Act was not neutral or generally applicable or that it was applied to him differently because of his religious beliefs).

B

But the First Amendment is not the only potential refuge for Kaemmerling's religious claim—the RFRA offers religious exercise greater protection from intrusion by religion-neutral federal laws. The RFRA prohibits the federal government from "substantially burden[ing]" a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate that "application of the burden to the person– (1) is in furtherance of a compelling

governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *see id.* § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief."). Congress instructs us that, in analyzing a claim under the RFRA, we must return to "the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)." 42 U.S.C. § 2000bb(b)(1).

1

To apply this test, we first must determine if Kaemmerling alleges a substantial burden on his religious exercise. The RFRA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7). A litigant's claimed beliefs "must be sincere and the practice[] at issue must be of a religious nature." *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002). Because the burdened practice need not be compelled by the adherent's religion to merit statutory protection, we focus not on the centrality of the particular activity to the adherent's religion but rather on whether the adherent's sincere religious exercise is substantially burdened. *See id.* at 1321. A substantial burden exists when government action puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981), as in *Sherbert*, where the denial of unemployment benefits to a Sabbatarian who could not find suitable non-Saturday employment forced her "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand," *Sherbert*, 374 U.S. at 404. An inconsequential or *de minimis*

burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme. *See Levitan*, 281 F.3d at 1320-21.

In his complaint, Kaemmerling alleges that it is his sincere religious belief that DNA is "a foundational aspect . . . of God's creative work" and that "DNA sampling, collection and storage with no clear limitations of use, merely to satisfy the broadly overreaching efforts of secular authorities, politicians and their representatives" "defile[s] God's temple, as represented by one's mortal body, filled with the Holy Spirit." His complaint further alleges harms arising from government possession and storage of his DNA profile, including the potential that he could become an unwilling participant in future activities that violate his religious beliefs—including cloning experiments and stem-cell research—and use of his DNA profile by the anti-Christ, who according to Kaemmerling's religious beliefs will in the future rule the world and "make war against the saints," "forc[ing] everyone . . . to receive a mark . . . which is the . . . number of his name."

As a preliminary matter, we pause to discern Kaemmerling's alleged religious beliefs. Kaemmerling makes abundantly clear that he does not challenge the collection of any particular DNA carrier—such as blood, saliva, skin, or hair—but rather that, regardless of the medium by which the government acquires access to his DNA, he objects to the government collecting his DNA information from any fluid or tissue sample they may recover. At oral argument, counsel emphasized that Kaemmerling objects to any collection of his DNA profile at all, even collecting DNA information from hair and skin that he naturally shed onto his clothes then turned over to prison officials for washing. (Indeed, the fact that he does not object to the means of the DNA collection is the very reason that the BOP can offer no remedy for purposes of exhaustion.) These

representations make clear that Kaemmerling does not object to DNA collection on the basis of bodily violation. He also certainly does not object to the BOP sweeping up his hair after a haircut or wiping up dust that contains particles of his skin, even though those are acts of collecting bodily specimens containing DNA, if the BOP does not extract the DNA information contained in those specimens. His objection to "DNA sampling and collection," then, must be a more specific objection to collection of the DNA information contained within any sample. It is not penetrating the body or collecting bodily material that Kaemmerling alleges violates his beliefs but rather collecting the "building block of life" specifically. Given these representations, we understand Kaemmerling's objection to "DNA sampling and collection" not to be an objection to the BOP collecting any bodily specimen that contains DNA material such as blood, saliva, skin, or hair, but rather an objection to the government extracting DNA information from the specimen.

Accepting as true the factual allegations that Kaemmerling's beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened—we conclude that Kaemmerling does not allege facts sufficient to state a substantial burden on his religious exercise because he cannot identify any "exercise" which is the subject of the burden to which he objects. The extraction and storage of DNA information are entirely activities of the FBI, in which Kaemmerling plays no role and which occur after the BOP has taken his fluid or tissue sample (to which he does not object). The government's extraction, analysis, and storage of Kaemmerling's DNA information does not call for Kaemmerling to modify his religious behavior in any way—it involves no action or forbearance on his part, nor does it otherwise interfere with any religious act in which he engages. Although the government's activities with his fluid or tissue

sample after the BOP takes it may offend Kaemmerling's religious beliefs, they cannot be said to hamper his religious exercise because they do not "pressure [him] to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718.

Kaemmerling alleges no religious observance that the DNA Act impedes, or acts in violation of his religious beliefs that it pressures him to perform. Religious exercise necessarily involves an action or practice, as in *Sherbert*, where the denial of unemployment benefits "impede[d] the observance" of the plaintiff's religion by pressuring her to work on Saturday in violation of the tenets of her religion, 374 U.S. at 404, or in *Yoder*, where the compulsory education law compelled the Amish to "perform acts undeniably at odds with fundamental tenets of their religious beliefs," 406 U.S. at 218. Kaemmerling, in contrast, alleges that the DNA Act's requirement that the federal government collect and store his DNA information requires the government to act in ways that violate his religious beliefs, but he suggests no way in which these governmental acts pressure him to modify his own behavior in any way that would violate his beliefs. *See* Appellant's Br. at 21 (describing alleged substantial burden as "knowing [his] strongly held beliefs had been violated by a[n] unholy act of an oppressive regime").

Nor does the criminal penalty for "fail[ure] to cooperate," 42 U.S.C. § 14135a(a)(5), in the collection of "a tissue, fluid, or other bodily sample . . . on which a DNA analysis can be carried out," *id.* § 14135a(c)(1), substantially burden Kaemmerling's exercise of religion. He objects only to the collection of the DNA information from his tissue or fluid sample, a process the criminal statute does not address, and he does not allege that his religion requires him not to cooperate with collection of a fluid or tissue sample. Moreover, he alleges that even "involuntary and/or forced collection" of his DNA would "violate[] [his]

convictions." The criminal statute is therefore no inducement for Kaemmerling to cooperate and potentially violate his beliefs, because he alleges that collection of his DNA sample would violate his convictions whether or not he acquiesces in the process. Thus, Kaemmerling does not allege that he is put to a choice like the plaintiffs in *Yoder*, between criminal sanction and personally violating his own religious beliefs. *See Yoder*, 406 U.S. at 218.

This case is instead more analogous to *Bowen v. Roy*, 476 U.S. 693 (1986), where the Supreme Court held that the state's use of a Native American child's Social Security number in determining eligibility for federal welfare benefit programs did not impair her parents' freedom to exercise their religious beliefs, a tenet of which was that use of the number beyond her control would "rob [her] spirit." *Id.* at 696; *see id.* at 697, 699. The parents objected to a statutory requirement that state agencies "shall utilize" Social Security numbers "not because it place[d] any restriction on what [they could] believe or what [they could] do," but because they believed use of the number, an entirely governmental act, would harm the child's spirit. *Id.* at 699. The Court concluded that the government's use of the child's Social Security number did not "in any degree" impair her parents' freedom to believe, express, or exercise their religion, emphasizing that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens. . . . [A]ppellees may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter." *Id.* at 699-700.

Similarly, Kaemmerling's objection to the DNA Act centers on the government's act of extracting and analyzing his DNA to collect its information and store an electronic DNA profile,

without suggesting that the Act imposes any restriction on what Kaemmerling can believe or do. Like the parents in *Bowen*, Kaemmerling's opposition to government collection and storage of his DNA profile does not contend that any act of the government pressures him to change his behavior and violate his religion, but only seeks to require the government itself to conduct its affairs in conformance with his religion. Kaemmerling thus fails to allege a substantial burden on his religious exercise that would be cognizable under the RFRA.

To the extent that Kaemmerling challenges storage of his DNA profile or retention of the DNA sample itself based on fear of specific future misuses that would conflict with his religious beliefs, we emphasize that we must consider the statute as it exists and is applied today, complete with its protections against misuse, *see* 42 U.S.C. §§ 14132(b)(3) (limiting the permissible uses of DNA profiles and stored samples), 14133(c) & 14135e (providing criminal penalties for those who improperly disclose or receive DNA information or samples), and we cannot pass on hypothetical future harms. *See Johnson*, 440 F.3d at 499; *Kincade*, 379 F.3d at 837-38.

2

Even if Kaemmerling did allege a substantial burden on his exercise of religion, his complaint would still fail to state a claim for relief because the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that . . . interest," satisfying the RFRA exception. 42 U.S.C. § 2000bb-1(b).

The DNA Act serves the compelling governmental interest in accurately and expeditiously solving past and future crimes in order to protect the public and ensure conviction of the guilty and exoneration of the innocent. *See Schall v. Martin*, 467 U.S.

253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." ) (quotation omitted); *United States v. Weston*, 255 F.3d 873, 880-81 (D.C. Cir. 2001) ("The [Supreme] Court has repeatedly adverted to the government's 'compelling interest in finding, convicting, and punishing those who violate the law.' *Moran v. Burbine*, 475 U.S. 412, 426 (1986); *accord Texas v. Cobb*, 532 U.S. 162, [172-73] (2001); . . . *McNeil v. Wisconsin*, 501 U.S. 171, 181 (1991); *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)."); *United States v. Amerson*, 483 F.3d 73, 87 (2d Cir. 2007) ("There can be little doubt that the government has a compelling interest in rapidly and accurately solving crimes and that having DNA-based records of the identity of . . . past offenders . . . effectuates this interest."). Courts have consistently held that the Act furthers these compelling interests. *See Banks v. United States*, 490 F.3d 1178, 1188-89 (10th Cir. 2007) (DNA Act provides "dramatically effective tool" for solving crime and exonerating the innocent); *United States v. Conley*, 453 F.3d 674, 678 (6th Cir. 2006) (Act serves governmental interests in solving past and future crimes and protecting communities where felons are released); *Johnson*, 440 F.3d at 497 (Act helps "solve past and future crimes," in furtherance of government's "*duty* . . . to protect the public"); *United States v. Sczubelek*, 402 F.3d 175, 185-86 (3d Cir. 2005) ("The interest in accurate criminal investigations and prosecutions is a compelling interest that the DNA Act can reasonably be said to advance," along with "protecting society from future criminal violations."); *Kincade*, 379 F.3d at 838-39 & n.38 (Act furthers the "undeniably compelling" interests of ensuring parolee complies with requirements of release, solving past crimes, sheltering society from future victimization, prosecuting crimes accurately, and absolving the innocent expeditiously); *see also* 42 U.S.C. § 14135 Note(a)(1)-(3) (DNA testing is "the most reliable forensic technique for identifying criminals when biological material is left at a crime scene" and

"can, in some cases, conclusively establish . . . guilt or innocence" and in others can "have significant probative value"); *id.* (a)(6)-(7) ("DNA testing can and has resulted in the post-conviction exoneration" of innocent people and in some of those cases "also enhanced public safety by providing evidence that led to the apprehension of the actual perpetrator").

Fundamental to the Act is the government's compelling interest in accurately identifying convicted offenders. *Banks*, 490 F.3d at 1188 ("It is well settled that once an individual has been convicted, his or her identity becomes a matter of compelling interest to the government.") (quotation and alteration omitted); *see Conley*, 453 F.3d at 678 (government interest in collecting DNA includes "the creation of a permanent record of the identities of convicted felons"); *Johnson*, 440 F.3d at 497 ("[T]he government is 'quite justified' in taking steps to keep tabs on ex-convicts."); *Sczubelek*, 402 F.3d at 185 ("[T]he government . . . has a compelling interest in the collection of identifying information of criminal offenders."). DNA profiling furthers this interest in a way no other identifying feature can, because DNA is unique to each individual (excepting identical twins) and cannot, within current scientific knowledge, be altered or disguised. *See Jones v. Murray*, 962 F.2d 302, 307 (4th Cir. 1992).

Finally, courts also agree that the deterrent effect of compulsory DNA profiling under the Act serves "society's enormous interest in reducing recidivism." *Kincade*, 379 F.3d at 838; *see Johnson*, 440 F.3d at 497 ("[T]he government is 'quite justified' in taking steps[, namely enforcing the DNA Act,] . . . to deter recidivism."); *Banks*, 490 F.3d at 1189 ("[C]ollecting DNA combats recidivism by solving crimes and removing criminals from the streets and by deterring future criminal acts by felons on release, presumably because the felons know that they are more easily identifiable when the

authorities have their DNA."); *Conley*, 453 F.3d at 678 (government interest in collecting DNA for "deterrence of future criminal acts by felons on release"); *Sczubelek*, 402 F.3d at 186 ("[C]ollection of [DNA] will indirectly promote the rehabilitation of criminal offenders by deterring them from committing crimes in the future.").

Kaemmerling argues that the government has not shown—and cannot show, at this pre-evidentiary stage of the case—that the DNA Act serves a compelling interest as applied to him, "a first-time offender convicted of a non-violent crime that did not turn on DNA evidence." The RFRA demands that "the compelling interest test [be] satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal ("UDV")*, 546 U.S. 418, 430-31 (2006) (quoting 42 U.S.C. § 2000bb-1(b)). We must look beyond the "broadly formulated interests justifying the general applicability" of the statute to examine the interests the government seeks to promote as applied to Kaemmerling "and the impediment to those objectives" that would flow from granting him a specific exemption. *Id.* at 431; *see Yoder*, 406 U.S. at 213.

We first note that Congress specifically amended the DNA Act in 2004 to expand the qualifying federal offenses that subject an offender to DNA sampling to include "[a]ny felony." 42 U.S.C. § 14135a(d)(1) (as amended by the Justice for All Act of 2004, Pub. L. 108-405, 118 Stat. 2260, at 2270). The Act previously only affected felons who had committed violent crimes such as murder, sexual abuse, and kidnaping. *See* DNA Analysis Backlog Elimination Act of 2000, Pub. L. 106-546, 114 Stat. 2726, at 2729-30. This amendment is definitive evidence that nonviolent offenders were in fact the intended object of the compelling interests Congress sought to advance

through the Act.

Indeed, the interests served by the DNA Act are compelling as to nonviolent first-time felons and violent recidivists alike. Kaemmerling's status as a nonviolent felon or first-time offender in no way undermines DNA profiling as an effective way to identify and "keep tabs on" him. *See Banks*, 490 F.3d at 1190. As unchangeable personal identifiers, DNA profiles can do more than verify a suspect's presence at the scene of a crime. They can, for example, be used to identify a felon "who has attempted to alter or conceal his or her identity." *See Jones*, 962 F.2d at 308. The identification purpose therefore serves interests aside from catching repeat offenders.

The government's compelling interest in accurately and expeditiously solving crime, by matching DNA evidence to an offender profile and by quickly excluding innocent offenders, also applies to felons previously convicted of nonviolent crimes and those who are first-time offenders. DNA exists in numerous parts of the body that even nonviolent criminals leave behind, including hair, saliva, and skin cells, and modern technology can generate a DNA profile from just thirty to fifty cells. *See Banks*, 490 F.3d at 1190 (citing studies documenting "identifiable quantities of human DNA on doorknobs, coffee cups, and other common items"); *Kincade*, 379 F.3d at 838 n.37 ("[A] new crime lab planned for New York City expects to generate profiles culled from as little as 6 cells' worth of genetic material collected at the scene of nearly every crime committed in the city—including . . . property offenses like home burglaries and auto thefts." (citing Shalia K. Dewan, *As Police Extend Use of DNA, a Smudge Could Trap a Thief*, N.Y. Times, May 26, 2004)). Although it may be true that law enforcement officers currently use DNA evidence more often in solving violent crimes than nonviolent ones, the even stronger interest in collecting the DNA of violent offenders does not diminish the

connection between taking and storing the DNA of nonviolent offenders and the government's crime-solving interest. *See Amerson*, 483 F.3d at 88 n.15 ("DNA can be, and is increasingly, being used to solve non-violent crimes.").

In addition, Kaemmerling's status as a first-time offender does not diminish the government's crime-solving interest as related to him. Even if Kaemmerling never re-offends, his DNA profile would still further this purpose because law enforcement uses the CODIS not only to identify a perpetrator but also to swiftly and efficiently eliminate countless potential suspects. Of course, all recidivists were once first-time offenders, so the government also has an interest in determining if Kaemmerling will be such a case, given that he has already demonstrated a willingness to commit a crime meriting imprisonment. Other courts addressing this issue have observed that nonviolent offenders not only have a higher recidivism rate than the general population, but certain groups—such as property offenders— have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent. *Ewing v. California*, 538 U.S. 11, 26 (2003) (citing U.S. Dept. of Justice, Bureau of Justice Statistics, P. Langan & D. Levin, *Special Report: Recidivism of Prisoners Released in 1994*, p.1 (June 2002)); *Banks*, 490 F.3d at 1191; *see Amerson*, 483 F.3d at 89 n.15 ("[E]xperience indicates that samples collected on the basis of convictions for nonviolent offenses are actually among the most useful in solving crimes, including violent crimes." (quoting H.R. Rep. No. 106-900(I), at *29 (letter from Dept. of Justice))). Even white-collar criminals like Kaemmerling appear to show a high level of recidivism, with fraud and larceny offenders demonstrating only slightly lower rates of recidivism than other offenders. *Amerson*, 483 F.3d at 88 n.15 (citing U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computations of the Federal Sentencing Guidelines*, at 30, Exh. 11 (May 2004),

and U.S. Dep't of Justice, *Profile of Nonviolent Offenders Exiting State Prisons*, at 2 (Oct. 2004)); *see Conley*, 453 F.3d at 679 ("[R]ecidivism in certain groups of white-collar criminals is very close to the rate of recidivism in firearm offenders, and is only slightly lower than felons convicted of robbery." (citation omitted)).

Finally, because law enforcement officials can find usable DNA evidence related to both violent and nonviolent crimes, the Act's compelling interest in deterring recidivism applies undiminished to Kaemmerling, who has already displayed his need for a deterrent in his willingness, as mentioned before, to commit a felony meriting imprisonment. Regardless of whether a felon has been convicted of one or many offenses and regardless of whether he is tempted to commit a violent or nonviolent crime in the future, his knowledge that the government has stored an unchangeable aspect of his identity that can be used to ferret out his best attempts at concealing future crime certainly furthers the government's deterrence interest.

3

Having concluded that the government has a compelling interest in extracting and storing Kaemmerling's DNA information for identification, we have no trouble concluding that application of the DNA Act to Kaemmerling "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). A statute or regulation is the least restrictive means if "no alternative forms of regulation would [accomplish the compelling interest] without infringing [religious exercise] rights." *Sherbert*, 374 U.S. at 407. While we acknowledge the government's argument that an intrusion like drawing blood might be considered an acceptably minimal invasion of privacy interests under the Fourth Amendment, it

does not necessarily follow that it is the means least restrictive of religious exercise under the RFRA.

It is not the method of collecting the tissue or fluid sample for DNA analysis which Kaemmerling alleges burdens his religious exercise, so this is not a case like *United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007), in which the religious adherent's beliefs prohibited him from giving blood, but the court considered whether other methods of obtaining a DNA sample would intrude less on his beliefs. Because Kaemmerling alleges that collecting his DNA information at all is what impedes his religious exercise, a less restrictive alternative would exist only if some means of identification other than DNA would accomplish the government's compelling purposes.

No less restrictive alternative exists. As Congress stated, DNA profiling is currently "the most reliable forensic technique for identifying criminals when biological material is left at a crime scene." 42 U.S.C. § 14135 Note(a)(1). Perhaps more importantly, it is the one identifying characteristic that criminals cannot change, disguise, or hide to avoid detection. As the Fourth Circuit explained,

> It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. The individuality of the DNA provides a dramatic new tool for the law enforcement

> effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime within samples of blood, skin, semen or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

*Jones*, 962 F.2d at 307. Any alternative method of identification would be less effective in identifying offenders and much more easily capable of evasion, thus "adversely affect[ing]" the government's compelling interests. *Yoder*, 406 U.S. at 236 (asking how the state's "admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish"); *see UDV*, 546 U.S. at 431 (discussing *Yoder*); *cf. Sherbert*, 374 U.S. at 408-09 (explaining that providing Sabbatarian business owners an exception to Sunday closing laws was not an adequate less restrictive alternative in *Braunfeld v. Brown*, 366 U.S. 599 (1961), because the exception appeared to present an administrative problem or to afford the exempted class a competitive advantage rendering the Sunday closing scheme unworkable).

## C

Kaemmerling's complaint also alleges violations of his Fifth Amendment rights to equal protection and against self-incrimination and his Fourth Amendment right to be free from unreasonable searches and seizures.

Kaemmerling argues that the DNA Act violates the equal protection component of the Due Process Clause because it requires collection of DNA from felons who are incarcerated or on supervised release but does not mandate collection of DNA from "free" felons, who are no longer under the supervision of the BOP. Because prisoners are not a suspect class, we must sustain the statute's classification "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Tucker v. Branker*, 142 F.3d 1294, 1300 (D.C. Cir. 1998) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)). Even if Congress has not articulated the purpose supporting the distinction, we must uphold it "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller*, 509 U.S. at 320. The DNA Act certainly passes the rational basis test. The BOP exerts a measure of control over incarcerated felons and felons on supervised release that it does not exert over felons who are now out of the prison system, making it significantly easier for the BOP to collect DNA samples from incarcerated and supervised felons than from free felons. *See Tucker*, 142 F.3d at 1300 (control over prisoner funds as compared to indigents at large is rational basis for treating prisoners and non-prisoners differently with respect to filing fees). Moreover, the statute's alleged underinclusiveness is not a basis for invalidating it, because under rational basis review Congress may choose to proceed "one step at a time," applying remedies to "one phase of one field [while] . . . neglecting the others." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955); *see United States v. Holland*, 810 F.2d 1215, 1219 (D.C. Cir. 1987); *see also Roe v. Carcotte*, 193 F.3d 72, 82 (2d Cir. 1999) (concluding state DNA statute does not violate equal protection by targeting incarcerated sex offenders but not prior sex offenders currently residing in the community).

Regarding the privilege against compelled self-incrimination, Kaemmerling argues that the DNA Act is unconstitutional because it requires him to give the government potentially incriminating evidence for later use against him in court. The Fifth Amendment privilege bars only compelling testimonial communications from an accused, not making the accused a source of physical evidence. *Schmerber v. California*, 384 U.S. 757, 763-64 (1966). So the forced extraction of a blood sample, to be chemically analyzed for alcohol content and used against the accused, was not compelled self-incrimination because "the blood test evidence, although an incriminating product of compulsion, was neither [the accused's] testimony nor evidence relating to some communicative act or writing by the [accused]." *Id.* at 765. For the same reason, a DNA sample is not a testimonial communication subject to the protections of the Fifth Amendment. *See Wilson v. Collins*, 517 F.3d 421, 431 (6th Cir. 2008) (extraction of DNA does not implicate the privilege because DNA samples are physical, not testimonial, evidence); *United States v. Reynard*, 473 F.3d 1008, 1021 (9th Cir. 2007) (same); *United States v. Hook*, 471 F.3d 766, 773-74 (7th Cir. 2006) (same); *Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir. 1996) (same).

Kaemmerling's complaint also asserts that collecting a sample of his DNA pursuant to the Act violates his Fourth Amendment right to be free from unreasonable searches and seizures because the Act unconstitutionally authorizes a blanket, suspicionless search for general law enforcement purposes. But we have already held, in a previous challenge to the DNA Act, that "the Fourth Amendment . . . certainly permits the collection of a blood sample [for DNA analysis] from a *convicted* felon . . . while he is still on probation," much less from a currently incarcerated felon. *Johnson*, 440 F.3d at 497; *see id.* ("[T]he Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken from

incarcerated felons for the purpose of identifying them." (quotation omitted)); *Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (no reasonable expectation of privacy in prison cell); *Bell v. Wolfish*, 441 U.S. 520, 558-60 (1979) (body cavity inspections after contact visits in prison are not unreasonable under the Fourth Amendment). That decision, which accords with the opinion of every court of appeals to consider the issue, forecloses Kaemmerling's claim. *See Johnson*, 440 F.3d at 496 (listing cases from the Second, Third, Fourth, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits); *United States v. Weikert*, 504 F.3d 1, 14 (1st Cir. 2007); *United States v. Conley*, 453 F.3d 674, 680-81 (6th Cir. 2006); *United States v. Kraklio*, 451 F.3d 922, 924-25 (8th Cir. 2006).

IV

For the foregoing reasons, we conclude that Kaemmerling's complaint fails to state a claim upon which relief can be granted and therefore should be dismissed. Dismissal of the case moots Kaemmerling's appeal from the district court's denial of his motion for a preliminary injunction, as he no longer has a potential claim or continuing litigation and we have adjudged him unsuccessful on the merits of his case. We affirm the district court's judgment dismissing Kaemmerling's complaint, but order that the dismissal be with prejudice.