FLAUM, Circuit Judge,
dissenting.
While Notre Dame’s appeal from the district court’s denial of a preliminary injunction was pending before this court, we granted the students’ motion to intervene. Notre Dame then moved to dismiss the appeal in order to conduct additional discovery in the district court. Dismissal would not prejudice the government or the student-intervenors. Nor would it inhibit this court’s review of the ultimate issues at a later stage in the proceedings. Because I see no reason not to “accept plaintiffs’ decision to proceed to trial without interim relief,” Creaton v. Heckler, 781 F.2d 1430, 1431 (9th Cir.1986), I would grant Notre Dame’s motion and dismiss this appeal.
The majority does not agree, however, and so the appeal remains before us. Faced with the merits, I conclude that Notre Dame has made out a credible claim under the Religious Freedom Restoration Act. I therefore would grant the university a preliminary injunction forbidding the government from penalizing Notre Dame for refusing to comply with the self-certification requirement.
I.
Notre Dame filed an emergency motion for an injunction pending appeal on December 23, 2013. At that point, its attention was fixed on the looming January 1, 2014 deadline, the date that the mandate and relevant regulations would go into effect. The court denied the motion on December 30 and ordered expedited briefing. The following day, the university— “forced,” in its words, “to choose between potentially ruinous fines and compliance with the Mandate” — opted to submit its self-certification form while it continued to litigate this appeal. See Notre Dame Issues Statement on Contraceptive Care In *563 junction Denial, WNDU.com (Dec. 31, 2013), available at http://tinyurl.com/kyhn6 op (last visited Feb. 20, 2014). On January 14, the day after Notre Dame filed its opening brief, the court granted the students’ motion to intervene. The students intended to, and in fact later did, advance a number of arguments that the government had not pursued in the district court. Shortly thereafter, Notre Dame moved to dismiss its appeal. The government took no position on the motion for voluntary dismissal, and the students opposed it. The motion was taken under advisement.
Federal Rule of Appellate Procedure 42 permits us to dismiss an already-docketed appeal “on the appellant’s motion on terms agreed to by the parties or fixed by the court.” Fed. R.App. P. 42(b). Even where the parties do not agree on terms, we apply a “presumption in favor of dismissal,” Albers v. Eli Lilly & Co., 354 F.3d 644, 646 (7th Cir.2004) — as well we should, for normally it makes very little sense to force an appellant into court against his will. This presumption would appear to be stronger when the appeal is an interlocutory one. Such a dismissal will not prejudice any future determination on the merits and will put the appellee in no worse position than if the appellant had not taken an appeal to begin with. At the same time, however, this presumption may be overcome by other prudential considerations. Appellate review is not a “bargaining chip” to be played and then casually conceded after a bad card is dealt. Id. (citing U.S. Bancorp Mortgage Co.- v. Bonner Mall P’ship, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994)).
Invoking the Albers case, the student-intervenors accuse Notre Dame of “procedural gamesmanship” for moving to dismiss the appeal after its pleas for urgent relief earlier in the litigation. But for Notre Dame, the circumstances of this case changed significantly on January 1, by which point the expedited briefing schedule had already been set. They changed yet again on January 14, when the student-intervenors entered the case. Certainly Notre Dame is not the first party to reassess the wisdom of taking an appeal in light of later developments. Cf. Tyndale House Publishers, Inc. v. Sebelius, No. 13-5108, 2013 WL 2395168 (D.C.Cir. May 3, 2013) (granting the government’s opposed motion for voluntary dismissal in a contraceptive-mandate case brought by a for-profit religious employer). In my judgment, if the university is willing to return to the district court and forego any chance at a preliminary injunction, we should not hold it to an expedited schedule that it did not request and to an appeal involving parties and arguments that it did not anticipate.
Importantly, Notre Dame has not “sought dismissal for the purpose of evading appellate determination.” United States v. Wash. Dep’t of Fisheries, 573 F.2d 1117, 1118 (9th, Cir.1978). To the contrary, the university tells us that it “fully expects to be back in this Court— either from its appeal or the Government’s appeal ... following the district court’s ruling on a permanent injunction.” This is a far cry from a case like Albers, where counsel for the appellant “essentially conceded]” that he decided after oral argument to dismiss the appeal for opportunistic reasons, in order to “try again, with a different client, at a different time or in a different court.” 354 F.3d at 646.
This case is also very much unlike United States v. Hagerman, where we denied an imputed motion for voluntary dismissal because it arose “with the appeal fully briefed and the merits free from doubt.” 549 F.3d 536, 538 (7th Cir.2008). Notre Dame requested dismissal a week before the government’s and intervenors’ briefs *564 were due; Notre- Dame’s reply brief (which addressed a.- number of the interve-nors’ new arguments) was due a week after that. More- to the point, and with respect for my colleagues’ views, I do not find the question in this case to be clear cut. There have been nineteen cases challenging the application of the mandate to religious nonprofits to date, and every plaintiff besides Notre Dame has received an, injunction.[1] In contrast to Hagerman, the merits in this case are hardly “free from doubt.” Id. I suggest that granting the motion to dismiss the appeal is the more prudential approach.
II.
.On the merits, I believe that Notre Dame has made put a credible claim that the Patient Protection and Affordable Care Act and accompanying regulations are a substantial burden on its exercise of religion. Accordingly, I would grant the university’s request for a preliminary injunction. See Ezell v. City of Chicago, 651 F.3d 684, 694 (7th Cir.2011) (setting forth the- legal standard for a preliminary injunction); cf. ACLU of Ill. v. Alvarez, 679 F.Bd 588, 589 (7th Cir.2012) (noting that the “loss of First Amendment freedoms, for even minimal periods of time,” constitutes an irreparable injury for which damages are not an adequate remedy).
The Religious Freedom Restoration Act provides that a federal law may not “substantially burden a person’s exercise of religion” unless the government “demonstrates that application of the burden to the person ... is in furtherance of a compelling governmental interest” and “is the least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000bb-l. For purposes of this *565 litigation, the government concedes that the least-restrictive-means exception does not apply, so we need only decide whether the burden that the Affordable Care Act imposes on Notre Dame is substantial.
In Korte v. Sebelius, this court said that a substantial burden arises “when the government ‘put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.’ ” 735 F.3d 654, 682 (7th Cir.2013) (quoting Thomas v. Review Bd. of Ind. Emp’t Div., 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)). Put another way, government action substantially burdens religious exercise if it “necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable.” Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir.2003) (interpreting a parallel provision in the Religious Land Use and Institutionalized Persons Act).
It is clear that if Notre Dame were forced to pay for contraceptive coverage against its religious beliefs or else incur significant monetary penalties, this would be a substantial burden. See Korte, 735 F.3d at 682-85. Unlike the for-profit plaintiffs in Korte, however, the university has an additional choice: a specially crafted accommodation “whereby the objecting employer gives notice to its insurance carrier and the insurer issues a separate policy with the mandated coverage.” Id. at 662. This accommodation permits a religious organization to discharge its obligations to provide contraceptive coverage by “self-certif[ying], in a form and manner specified by the [government],” that the organization “opposes providing coverage for some or all ... contraceptive services ... on account of religious objections,” “is organized and operates as a nonprofit entity,” and “holds itself out as a religious organization.” 26 C.F.R. § 54.9815-2713A(a). Among other things, the organization must provide a copy of the self-certification form, known as EBSA Form 700, to its insurance issuer or third-party administrator; those entities are then required to offer segregated contraceptive services'directly to plan participants and beneficiaries. Id. § 54.9815-2713A(b)-(c). However, if the organization does not self-eertify — and also does not provide the required, religiously objectionable coverage — it continues to face the same “ruinous fines” that constituted a substantial burden in Korte, 735 F.3d at 684.
I do not question that the accommodation is the government’s good-faith attempt to meet religious objectors halfway, and it makes this a somewhat closer case than Korte. Nevertheless, by putting substantial pressure on Notre Dame to act in ways that (as the university sees it) involve the university in the provision of contraceptives, I believe that the accommodation still runs afoul of RFRA.
The district court reasoned that the self-certification scheme is not a substantial burden because the scheme does not require the university to modify its behavior in any way. According to the court, “No-tre Dame need only step aside from contraception coverage, as it has always done and most assuredly would always do.” Similarly, the government tells us that by self-certifying, the university “is simply completing a form conveying that the University does not intend to provide contraceptive coverage.”
I do not view the required act so mechanistically. The accommodation does not merely require the religious organization to “step aside from contraceptive coverage.” It requires the organization to perform a new act that it did not have to perform before: completing and delivering to its insurer or third-party administrator the official EBSA Form 700. In the uni *566 versity’s eyes, this form’s “purpose and effect” — evident from the face of the regulations — “is to accomplish what the organization finds religiously forbidden and protests.” E. Tex. Baptist Univ. v. Sebelius, No. H-12-8009, — F.Supp.2d-,-, 2013 WL 6838893, at *20 (S.D.Tex. Dec. 27, 2013). As to health plans administered by third-party administrators in particular, the form flatly states that it is “an instrument under which the plan is operated.” Having to submit the EBSA Form 700, Notre Dame maintains, makes it “complicit in a grave moral wrong” by involving it with a system that delivers contraceptive products and services to its employees and students.
The majority has trouble accepting this position, in part due to the university’s statement that its signature will “trigger” contraceptive coverage, because the majority understands federal law to require contraceptive coverage regardless of what No-tre Dame signs or does not sign. But see Roman Catholic Archbishop of Wash. v. Sebelius, No. 13-1441, — F.Supp.2d-, -, 2013 WL 6729515, at *17, *22 (D.D.C. Dec. 20, 2013) (distinguishing between group health insurers, which have an independent obligation under the regulations to provide contraceptive coverage, and third-party administrators, which do not). Yet we are judges, not moral philosophers or theologians; this is not a question of legal causation but of religious faith. Notre Dame tells us that Catholic doctrine prohibits the action that the government requires it to take. So long as that belief is sincerely held, I believe we should defer to Notre Dame’s understanding.[2]
The district court relied in part on Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), and derivatively Kaemmerling v. Lappin, 553 F.3d 669 (D.C.Cir.2008), which the court thought foreclosed Notre Dame’s objection to a mere “administrative tool, used to relieve Notre Dame of liability for not providing contraceptive payments.” I do not read Roy as cutting so broadly. In fact, five justices in that case expressed the view that the plaintiffs “were entitled to an exemption” from an analogous “administrative” requirement — “that welfare recipients provide a social security number on their application.” Michael W. McConnell, Free Exercise Revisionism and the Smith Decision, 57 U. Chi. L.Rev. 1109, 1127 (1990) (emphasis added).
Roy involved a Free Exercise Clause challenge to federal regulations governing state-run food-stamp programs. The plaintiff Roy, a member of the Abenaki tribe, had sought benefits for his two-year-old daughter. Roy objected to two distinct aspects of the regulations. First, he objected to a requirement that each applicant furnish a social security number on the application. Second, he challenged a requirement that states utilize social security numbers in administering the program (principally to prevent abuse or waste). See 476 U.S. at 699, 106 S.Ct. 2147. Roy refused to furnish his daughter’s number because he feared its use would “rob” her spirit and diminish her spiritual purity. Id. at 696, 106 S.Ct. 2147. During the litigation, it became clear that the government had somehow obtained a social security number for Roy’s daughter independently. Id. at 697, 106 S.Ct. 2147. The *567 government argued that the case had become moot, but Roy disagreed. Id.
As the district court in this case correctly noted, the Court squarely rejected Roy’s free exercise challenge to the state’s use of the social security number, concluding that the First Amendment does not “require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens.” 476 U.S. at 699, 106 S.Ct. 2147. But a majority of justices indicated that the requirement that applicants furnish a social security number was a different matter. Five justices either concluded or strongly suggested that the government could not require an applicant to provide the number on a benefits application if the applicant-had a sincere religious objection to doing so.
Justice O’Connor, joined by Justices Brennan and Marshall, determined that the requirement burdened Roy’s exercise of religion, and that the government had “failed to show that granting a religious exemption to those who legitimately object to providing a Social Security number will do any harm to its compelling interest.” 476 U.S. at 732, 106 S.Ct. 2147 (O’Connor, J., concurring in part and dissenting in part). Justice White agreed; he would have enjoined both the provision and use requirements. - Id. at 733, 106 S.Ct.- 2147 (White, J., dissenting). Finally, Justice Blackmun would have remanded the case to determine whether the issue was moot. However, he stated that if the issue were squarely presented, he would have agreed with Justice O’Connor and held that the government could not deny, assistance based on a parent’s religious refusal to provide a social security number. Id. at 714-16, 106 S.Ct. 2147 (Blackmun, J., concurring in part).
To be sure, because only four justices actually reached the question, this conclusion does not constitute part of Roy’s holding. Nevertheless, it provides a useful framework for analyzing the facts of this case.[3]
Under Roy’s approach, it is clear that RFRA does not authorize religious organizations to dictate the independent actions of third-parties, even if the organization sincerely disagrees with them. See 476 U.S. at 700, 106 S.Ct. 2147 (noting that Roy could “no more prevail on his religious objection to the Government’s use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government’s filing cabinets”). That is true whether the third-party is the government, an insurer, a student, or some other actor. Cf. Korte, 735 F.3d at 684 (“[I]t goes without saying that [the plaintiffs] may neither inquire about nor interfere with the private choices of their employees on these subjects.”); Roman Catholic Archdiocese of N.Y. v. Sebelius, No. 12-2542, — F.Supp.2d-, -, 2013 WL 6579764, at *13 (E.D.N.Y. Dec. 16, 2013) (“[I]t seems unlikely that placing new legal obligations on the third-parties with whom plaintiffs contract could be a substantial burden on plaintiffs’ religion.”). So long as the government does not require the university itself to take action, RFRA does not give Notre Dame a right to prevent the government from providing contraceptives to its students and employees. Indeed, at oral argument, counsel for Notre Dame. acknowledged that the university would have no objection if the students or *568 employees had to opt in to receive contraceptive coverage from insurers.
But the self-certification requirement is different. It is one thing -for the government to take independent action. It is quite another for the government to “force[]” the university “to cooperate actively with the Government by themselves providing” the EBSA Form 700 — a form that, in Notre Dame’s view, endorses the provision of contraceptives to its students and employees. Roy, 476 U.S. at 714, 106 S.Ct. 2147 (Blackmun, J., concurring in part). That type of compulsion takes this case out of the realm of independent action and into the sort of “direct, primary, and fundamental” pressure that renders “religious exercise ... effectively impracticable.” Civil Liberties for Urban Believers, 342 F.3d at 761.
The Supreme Court’s recent decision to grant a temporary injunction in a similar RFRA challenge suggests to me that a majority of justices may continue to hold this view of free exercise rights (although now as a statutory matter, and not a constitutional one). See Little Sisters of the Poor v. Sebelius, No. 13-cv-2611, — F.Supp.2d-, 2013 WL 6839900 (D.Colo. Dec. 27, 2013), injunction pending appeal granted, — U.S.-, 134 S.Ct. 1022, 187 L.Ed.2d 867 (2014). Notably, the burden on the plaintiffs in Little Sisters appears less significant than the one on Notre Dame. The government tells us that Little Sisters provides group health insurance through a self-insured “church plan” that, because of a peculiar twist in ERISA, is itself exempt from the requirement to assume responsibility for contraceptive coverage. Under the current regime, the form that Little Sisters refuses to sign is entirely unconnected to the actual provision of contraceptive services, yet the Supreme Court still granted the requested injunction. Should the mandate be enforced in this case, by contrast, Notre Dame will continue to self-certify as part of a scheme that will actually deliver products and services to which the university has a religious objection. I am well aware that the order in Little Sisters “should not be construed as an expression of the Court’s views on the merits.” 134 S.Ct. at 1022. However, I believe the Court’s action strengthens the case for a preliminary injunction here, where the burden is, if anything, more concrete.
Now that Notre Dame has signed the self-certification form, the majority doubts whether we could grant the university any form of meaningful relief. I agree that we cannot enjoin the university’s insurers from providing contraceptive coverage or require the government to forbid the insurers from doing so. However, this only underscores the point that Notre Dame does not (and cannot) take issue with the independent actions of third-parties. Meaningful relief follows from what Notre Dame does object to: a regulation that requires it either to pay for contraceptive services or self-certify that it has a religious objection in order to avoid substantial fines. I would therefore enjoin the government from enforcing the penalty against Notre Dame for not providing contraceptive coverage — even if Notre Dame revokes or fails to maintain its EBSA Form 700, refuses to make the form available for examination upon request, or takes any action otherwise inconsistent with 26 C.F.R. § 54.9815-2713A.
III.
My conclusion is not intended to disparage the government’s efforts at accommodation in this difficult area. Especially after Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), how best to accommodate the twin demands of religious faith and secular poli *569 cy has become a challenging political problem as much as a legal one. Our interpretation of RFRA can only go so far in solving it. Cf. Lyng v. Nw. Indian Cemetery Protective Ass’n, 485 U.S. 439, 452, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (“[Legislatures and other institutions,” not courts, must “reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours”). Whatever the eventual outcome of this litigation, it would be unfortunate if it dissuaded either the government or religious institutions from taking further steps toward mutually acceptable accommodation.
Because dismissal of this appeal is no longer an option, I conclude that Notre Dame has shown a likelihood of success on the merits, and that it has met the other requirements for a preliminary injunction. I would therefore reverse the district court’s order denying relief. I respectfully dissent.

. The intervenors insinuate that sincerity is at issue, hinting at the possibility of last-minute influence by a group called the Sycamore Trust. While the district court may find a warrant for this suggestion once discovery proceeds, so far as I can determine, there is currently no basis in the record for concluding that Notre Dame has been insincere in advancing this litigation.

. Although Roy is a Free Exercise Clause case, not a RFRA case, "Congress was clear that RFRA codifies pre-Smith free-exercise jurisprudence.” Korte, 735 F.3d at 679 (referring to Employment Division v. Smith, 494 U.S. 872, 110 S.Ct 1595, 108 L.Ed.2d 876 (1990)).