# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 21, 2010        Decided June 21, 2011

No. 09-7131

PATRICK MAHONEY, REVEREND, ET AL.,
APPELLANTS

v.

JOHN DOE, IN HIS OFFICIAL CAPACITY AS A POLICE OFFICER,
METROPOLITAN POLICE DEPARTMENT, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00105)

———

*Carly F. Gammill* argued the cause for appellants. With her on the briefs was *James Matthew Henderson Sr.*

*Carl J. Schifferle*, Assistant Attorney General, Attorney General's Office for the District of Columbia, argued the cause for appellees. With him on the brief were *Peter J. Nickles*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

*Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence* and *Marina U. Braswell*, Assistant U.S. Attorneys, were on the brief for *amicus curiae* National Park Service in support of appellees.

Before: HENDERSON, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

BROWN, *Circuit Judge*: Section 22-3312.01 of the District of Columbia Code prohibits the defacement of public and private property. Appellants, Rev. Patrick Mahoney, Kaitlin Clare Martinez, the Christian Defense Coalition, Cradles of Love, Inc., and Cheryl Conrad (collectively, "Mahoney") claim that prohibition, both on its face and as applied, violates their First Amendment right to chalk the 1600 block of Pennsylvania Avenue (literally, the street in front of the White House). The district court concluded otherwise. We now affirm.

I

On November 24, 2008, Mahoney notified the Metropolitan Police Department ("MPD") and the Department of the Interior ("DOI") of his intent to carry out a sidewalk chalk demonstration in front of the White House. The purpose of the demonstration was to protest President Obama's position on abortion, and to protest the anniversary of the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973).

The MPD responded to Mahoney's request, asking for more information about the number of protestors expected and the time the protest would occur. In addition, the MPD warned that sidewalk "chalking" in front of the White House would constitute defacement of public property in violation of the District of Columbia's Defacement Statute, D.C. Code § 22-3312.01 ("Defacement Statute").[1] The Defacement Statute provides:

> It shall be unlawful for any person or persons willfully and wantonly to disfigure, cut, chip, or cover, rub with, or otherwise place filth or excrement of any kind; to write, mark, or print obscene or indecent figures representing obscene or objects upon; to write, mark, draw, or paint, without the consent of the owner or proprietor thereof, or, in the case of public property, of the person having charge, custody, or control thereof, any word, sign, or figure upon: Any property, public or private, building, statue, monument, office, public passenger vehicle, mass transit equipment or facility, dwelling or structure of any kind . . . .

D.C. Code § 22-3312.01.

Mahoney responded by demanding the MPD reverse its position and provide a "written assurance POST HASTE" authorizing his chalking demonstration. In addition,

---

[1] The National Park Service ("NPS"), which maintains authority over the sidewalks abutting the 1600 block of Pennsylvania Avenue pursuant to an interagency agreement, also responded to Mahoney's request. The NPS said Mahoney's demonstration would violate NPS regulations prohibiting the defacement of cultural resources. *See* 36 C.F.R. §§ 2.1(a)(6), 2.31(a)(3).

Mahoney noted the District of Columbia had previously approved similar chalking events across the D.C. metropolitan area, including annual youth chalk art contests and a "Chalk for Peace" event in the summer of 2005. Three days after receiving Mahoney's letter, the MPD granted Mahoney approval to conduct an assembly in front of the White House "consisting of no more than 5,000 persons . . . permitted to possess signs and banners." The MPD refused, however, to grant Mahoney permission to "use chalk or any other material to mark the surfaces of Pennsylvania Ave."

On January 16, 2009, Mahoney sued the MPD and the District of Columbia (collectively, the "District"). Mahoney requested a temporary restraining order and preliminary injunction to keep the District from preventing Mahoney's chalking demonstration. The district court held an expedited hearing, but denied Mahoney's request for equitable relief without a written opinion. Two days later, Mahoney began chalking the street in front of the White House. MPD officers asked Mahoney for identification, confiscated his chalk, and directed him to stop. Mahoney obliged and the incident ended peacefully. The officers did not take Mahoney into custody or formally charge him with any offense.

After his failed chalking demonstration, Mahoney amended his complaint, adding John Doe, the unidentified MPD officer who prevented Mahoney from chalking on January 24, 2009, and asserting six separate causes of action, three of which Mahoney pursues on appeal. Mahoney claims the Defacement Statute is unconstitutional on its face, is unconstitutional as applied to his efforts to chalk the street in front of the White House, and violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.* The District moved to dismiss Mahoney's amended complaint, or in the alternative, for summary judgment. The district court

5

granted the District's motion. Because it is not "generally desirable" to consider a facial First Amendment challenge "before it is determined that the statute would be valid as applied," *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 484–85 (1989), we begin with Mahoney's as-applied challenge.

II

The First Amendment says, "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." Mahoney claims the First Amendment protects his right to chalk the street in front of the White House and the District violated this right "[b]y threatening to apply" the Defacement Statute to his expressive conduct. Comp. ¶ 170. To resolve Mahoney's claim, we proceed in three steps: first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the District's justifications for restricting Mahoney's speech "satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

A

This is a somewhat unusual First Amendment case. Section 22-3312.01 does not regulate speech; nor does the code section directly implicate the content of speech by defining the expressive content of the speech (e.g., a terrorist threat) as the relevant harm. The Defacement Statute criminalizes the conduct of defacing, defiling, or disfiguring property by various means—some of which are clearly expressive, like painting, drawing, or writing, while others, like vandalizing or physically damaging property, are

primarily destructive and only secondarily expressive. Moreover, because prohibited activities may be permitted with the land owner's consent, the Defacement Statute bears a likeness to more conventional licensing schemes. Thus, enforcement of the Defacement Statute will not always implicate the First Amendment.

But here, the parties agree the creation of words or images through chalk is an expressive act. Because the First Amendment "affords protection to symbolic or expressive conduct as well as to actual speech," Mahoney's proposal clearly implicates the First Amendment. *Virginia v. Black*, 538 U.S. 343, 358 (2003). The District's actions, therefore, can be analyzed within the usual First Amendment framework. The gravamen of this appeal is whether the District violated the constitutional guarantee by prohibiting Mahoney from placing his chalked message on the street in front of the White House.

B

"[T]he extent of scrutiny given to a regulation of speech—in effect, how we examine the directness with which it promotes the government's goals and the degree to which it burdens speech—depends on whether the regulation applies in a *public* or *nonpublic* forum." *Boardley v. United States Dep't of Interior*, 615 F.3d 508, 514 (D.C. Cir. 2010). The type of forum—public, designated public, or nonpublic—determines the extent to which government can control speech. *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1305–06 (D.C. Cir. 2005). "Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." *Cornelius*, 473 U.S. at 802. A designated public forum consists of "public property which the state has opened for

use by the public as a place for expressive activity." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Lastly, "a nonpublic forum is by contradistinction 'public property which is not by tradition or designation a forum for public communication.'" *Boardley*, 615 F.3d at 514 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).

There is little dispute the street in front of the White House is a public forum. "'[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'" *United States v. Grace*, 461 U.S. 171, 177 (1983) (citations omitted); *see also United States v. Doe*, 968 F.2d 86, 89 (D.C. Cir. 1992) (referring to the area in front of the White House—Lafayette Park—as a public forum). The District's ability to restrict expressive conduct in a traditional public forum is limited to the enforcement of time, place, and manner regulations, provided the restrictions "'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Grace*, 461 U.S. at 177 (quoting *Perry Educ. Ass'n*, 460 U.S. at 45).

The District argues the 1600 block of Pennsylvania Avenue is not a public forum when used as a "writing tablet." We interpret this as an argument that the 1600 block of Pennsylvania Avenue is a designated public forum that excludes certain media, including chalk. This is an odd inversion of the typical forum dispute. Ordinarily, a litigant argues the government has "carved out" a public forum from an otherwise nonpublic space. *See, e.g.*, *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 393–94 (1993) (finding school property a limited public forum); *Cornelius*, 473 U.S. at 802–05 (rejecting the argument that a charity drive at a government workplace is a

public forum inside a non-public forum); *Perry Educ. Ass'n*, 460 U.S. at 45 (1983) (rejecting the argument that a school district's internal mail system was a public forum); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 299–300 (1974) (same with regard to advertising space on city buses). In this case, however, the government proposes to limit a preexisting public forum by excising one class of expressive media.

The Supreme Court focuses on "the access sought by the speaker" in defining a limited public forum's boundaries. *Cornelius*, 473 U.S. at 801. But in so doing, the Court takes a "tailored approach," *id.*, "look[ing] to the policy and practice of the government," as well as "the nature of the property and its compatibility with expressive activity," *id.* at 802. Here, the record contains no evidence that the 1600 block of Pennsylvania Avenue has ever been designated as anything but a public forum. Although the street is no longer open to automobiles, it is open to pedestrians. It functions, for all practical purposes, as an extension of the abutting sidewalk, a space we previously held to be a public forum. *See White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1526–27 (D.C. Cir. 1984). Moreover, the distinction the District proposes is one without a difference: whether characterized as a public forum or a designated public forum, the same legal standard applies. *See Perry Educ. Ass'n¸* 460 U.S. at 46.

In any event, the District conceded the 1600 block of Pennsylvania Avenue is a public forum below, Motion to Dismiss at 3, Docket 17 ("Defendants agree . . . the 1600 block of Pennsylvania Avenue is a traditional public forum . . . ."), and raises this argument for the first time on appeal. *See Grant v. U.S. Air Force*, 197 F.3d 539, 542 (D.C. Cir. 1999) ("'Absent exceptional circumstances, the court of appeals is not a forum in which a litigant can present legal theories that it neglected to raise in a timely manner in

proceedings below.'") (quoting *Tomasello v. Rubin*, 167 F.3d 612, 618 n. 6 (D.C.Cir.1999)).

## C

Even under the standard that applies to speech restrictions in a traditional public forum, the District insists the chalking ban is narrowly tailored to serve a significant government interest. We agree.

First, the Defacement Statute is indisputably content neutral. It prohibits certain conduct (i.e. disfiguring, cutting, chipping, defacing or defiling), including certain expressive conduct (i.e. writing, marking, drawing, or painting), without reference to the message the speaker wishes to convey. D.C. Code § 22-3312.01. Nor is there any evidence in the record the District adopted the Defacement Statute "because of [agreement or] disagreement with the message" a speaker may convey. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Second, the District's interest in controlling the esthetic appearance of the street in front of the White House is substantial. In *City Council of Los Angeles v. Taxpayers for Vincent*, the Supreme Court upheld a Los Angeles ordinance regulating the posting of signs on public light posts. 466 U.S. 789, 806 (1984). In so doing, the Court stated that "municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Id.*; *see also, e.g.*, *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 507–08, 510 (1981) (visual clutter); *City of Shaker Heights*, 418 U.S. at 302 (intrusive advertising); *Kovacs v. Cooper*, 336 U.S. 77, 86 (1949) (loud sound trucks broadcasting messages). This is especially true here, where

the special nature of the forum serves to heighten esthetic concerns. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650–51 (1981) ("Consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved."); *White House Vigil*, 746 F.2d at 1534–37 (describing the special esthetic considerations relevant to restrictions on demonstrations at the White House).

The Defacement Statute is also sufficiently tailored to serve the District's esthetic interest. It is the tangible medium—chalking—that creates the very problem the Defacement Statute seeks to remedy. The same was true in *Taxpayers for Vincent*, where the Court noted "the substantive evil—visual blight—is not merely a possible by-product of [posting signs], but is created by the medium of expression itself." 466 U.S. at 810. Undoubtedly, the Defacement Statute encompasses some expressive activity. But "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968). It is true, the defacement at issue is temporary and can be cured. But the same was true in *Taxpayers for Vincent.* The government can proscribe even temporary blight. 466 U.S. at 810.

Finally, the District's threatened use of the Defacement Statute leaves Mahoney with alternative channels of communication. *Heffron*, 452 U.S. at 655 (holding state fair rule, prohibiting sale or distribution on fair grounds of any merchandise including printed or written material, did not violate First Amendment, as applied to members of a religious

sect because the rule did not "unnecessarily limit" the members' right to speak within the fairgrounds). The District granted Mahoney approval to conduct an assembly in front of the White House, for which he was "permitted to possess signs and banners." Mahoney argues this was inadequate because "the only thing [he] couldn't do was the only thing [he] asked to do." Oral Arg. Tr. 10. But the scope of Mahoney's request cannot define the available "channels of communication." If Mahoney exclusively asked to post signs on light posts, he could not do so under *Taxpayers for Vincent*, 466 U.S. at 810. And if Mahoney asked to litter, he could not do so under *Schneider v. State*, 308 U.S. 147, 160–62 (1939). Mahoney initially requested permission to conduct a "demonstration" consisting of "a variety of verbal and visual messages." The District's threatened use of the Defacement Statute did not curtail Mahoney's plans. Mahoney was free to announce any "verbal" message he chose. And, Mahoney could depict visual messages on signs, banners, and leaflets. Thus, ample alternative channels of communication existed.

In sum, the Defacement Statute is content neutral, and substantially justified by the District's esthetic interest in combating the very problem Mahoney's proposed chalking entails—the defacement of public property. Because the District did not curtail Mahoney's means of expression altogether, and allowed him to protest in front of the White House in other ways, the Defacement Statute is not unconstitutional as applied.

### III

In addition to his as applied challenge, Mahoney alleges the Defacement Statute is facially unconstitutional. "[T]o

prevail on a facial attack the plaintiff must demonstrate the challenged law either 'could never be applied in a valid manner' or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.'" *N.Y. State Club Ass'n. v. City of New York*, 487 U.S. 1, 11 (1988) (quoting *Taxpayers for Vincent*, 466 U.S. at 798).

## A

We need not linger too long on whether the Defacement Statute could ever be applied in a valid manner. As discussed above, it is constitutional as applied to Mahoney himself. Moreover, Mahoney only argues the Defacement Statute is unconstitutional to the extent it applies to public property. Oral Arg. Tr. at 25. But the statute applies to public and private property alike. D.C. Code § 22-3312.01. And, to the extent the Defacement Statute prohibits defacing private property, it does not abridge the First Amendment. *See Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655 (D.C. Cir. 1994) (citing *Lloyd Corp. v. Tanner*, 407 U.S. 551, 568 (1972)). Mahoney's facial challenge thus hinges on whether the Defacement Statute is overbroad. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); *Initiative and Referendum Inst.*, 417 F.3d at 1314–15.

## B

Under the overbreadth doctrine, "a person may challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him." *Ohralik v. Ohio State Bar Ass'n.*, 436 U.S. 447, 462 n.20 (1978). But "the scope of the First Amendment overbreadth doctrine . . . must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted." *New York v.*

*Ferber*, 458 U.S. 747, 769 (1982). To prevail, a party must show the statute at issue "is 'substantially' overbroad, which requires the court to find 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.'" *N.Y. State Club Ass'n.*, 487 U.S. at 11 (quoting *Taxpayers for Vincent*, 466 U.S. at 801).

Mahoney argues the Defacement Statute is overbroad because it targets "conduct commonly associated with expression," and provides the District with unbridled discretion to censor that expression. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760–61 (1988). But Mahoney fails to identify any "significant difference" between his facial and as applied challenges. *Taypayers for Vincent*, 466 U.S. at 802. Specifically, Mahoney does not argue the Defacement Statute is unconstitutional as-applied to any circumstances other than his own. Nor does Mahoney argue there is a likelihood of prosecution under the Defacement Statute that deters otherwise protected speech. In fact, Mahoney cites no prior example of the District's enforcement of the Defacement Statute, constitutional or not. And, Mahoney concedes, "the District itself sponsors and invites citizens to come and chalk in various locations throughout the city," even closing off a street annually for students to chalk. Oral Argument at 6. "The overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (quoting *N.Y. State Club Ass'n*, 487 U.S. at 14). In short, Mahoney's overbreadth challenge fails because he cannot show any "realistic danger" the Defacement Statute actually chills constitutionally protected speech. *N.Y. State Club Ass'n*, 487 U.S. at 11.

14

IV

Next, Mahoney claims the District violated his rights under the RFRA because his efforts to chalk the sidewalk in front of the White House were religiously motivated. The RFRA prohibits the District from "substantially burden[ing] a person's exercise of religion" unless the District "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b); *see id.* § 2000bb-2(1)–(2) (including the District as a "covered entity").

The district court accepted Mahoney's allegation that his proposed chalking was motivated by a sincere religious belief. But the district court rejected Mahoney's RFRA claim because his amended complaint did not establish chalk was the exclusive medium through which Mahoney could express his religious views. Indeed, the amended complaint alleges chalk art is only "part of [Mahoney's] public prayer vigils, demonstrations, protests and rallies." Complaint ¶ 56. Mahoney argues the district court erred by narrowly focusing on the medium—not the message. According to Mahoney the district court should have exclusively considered (1) whether his religious belief was sincere, and (2) whether the District's action substantially burdened "a religious practice" of his.

Mahoney's novel two-step legal framework is at odds with this court's precedent. In *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001), we explained that "to make religious motivation the critical focus is . . . to read out of RFRA the condition that only substantial burdens on the exercise of religion trigger the compelling interest

requirement." *Id.* at 17. *Henderson* instead focused RFRA's "substantial burden" inquiry on the nexus between religious practice and religious tenet: whether the regulation at issue "force[d plaintiffs] to engage in conduct that their religion forbids or . . . prevents them from engaging in conduct their religion requires." *Id.* at 16. There is an important benefit of this latter approach. In adhering to RFRA's plain text, it avoids expanding RFRA's coverage beyond what Congress intended, preventing RFRA claims from being reduced into questions of fact, proven by the credibility of the claimant.

The facts of *Henderson* are also difficult to distinguish. There, we upheld a National Park Service regulation banning the sale of message-bearing t-shirts in designated sections of the National Mall, against a RFRA challenge brought by a group of evangelical Christians. *Id.* In so doing, we reasoned the ban on t-shirt sales was not a substantial burden on the exercise of religion because it was "at most a restriction on one of a multitude of means" by which the appellants could engage in their vocation to spread the gospel. *Id.* at 17 (noting appellants could "still distribute t-shirts for free on the Mall, or sell them on streets surrounding the Mall"). As in *Henderson*, the District's threatened use of the Defacement Statute prohibits only "one of a multitude of means" of conveying Mahoney's religious message. Mahoney may still spread his message through picketing, a public prayer vigil, or other similar activities in which he has previously engaged. The Defacement Statute does not realistically prevent Mahoney from chalking elsewhere, as Mahoney concedes the District allowed him to do in the past.

Mahoney attempts to distinguish *Henderson* on two grounds. First, he argues the Religious Land Use and Institutionalized Persons Act ("RLUIPA") overruled *Henderson* by amending RFRA's definition of "exercise of

religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." But, as the court explained when it denied the petition for rehearing en banc in *Henderson*, "[RLUIPA] did not alter the propriety of inquiring into the importance of a religious practice when assessing whether a substantial burden exists." 265 F.3d 1072, 1074 (D.C. Cir. 2001). Second, Mahoney argues the regulation at issue in *Henderson* was a partial ban, prohibiting the "sale" of t-shirts but not their distribution, whereas the District's prohibition on chalking in front of the White House is complete. But this argument amounts to nothing more than a word game, altering the perceived breadth of the government restriction by narrowing the pertinent expressive activity at issue. There is nothing in *Henderson*, or in post-*Henderson* RLUIPA cases, that indicates RFRA's "substantial burden" analysis is subject to such manipulation.

V

Mahoney claims the Defacement Statute violates the First Amendment, both on its face, and as applied to his efforts at chalking the street in front of the White House. But Mahoney cannot bring a facial challenge because the Defacement Statute is constitutional in certain circumstances, and Mahoney points to no "realistic danger" that it will otherwise be applied in an unconstitutional manner. Nor can we distinguish Mahoney's as-applied claim from the as applied challenge rejected by the Supreme Court in *Taxpayers for Vincent*. As a result, the order of the district court dismissing this case is

*Affirmed.*

KAVANAUGH, *Circuit Judge*, concurring:

I agree with and join the Court's thorough and well-crafted opinion in its entirety. As the Court holds, the District of Columbia may prohibit defacement of Pennsylvania Avenue in front of the White House. The prohibition is a reasonable time, place, and manner restriction for purposes of First Amendment doctrine.

I add these few words simply because I do not want the fog of First Amendment doctrine to make this case seem harder than it is. No one has a First Amendment right to deface government property. No one has a First Amendment right, for example, to spray-paint the Washington Monument or smash the windows of a police car. As Justice Rehnquist succinctly said: "One who burns down the factory of a company whose products he dislikes can expect his First Amendment defense to a consequent arson prosecution to be given short shrift by the courts. . . . The same fate would doubtless await the First Amendment claim of one prosecuted for destruction of government property after he defaced a speed limit sign in order to protest the stated speed limit." *Smith v. Goguen*, 415 U.S. 566, 594 (1974) (Rehnquist, J., dissenting on separate point). When, as here, the Government applies a restriction on defacement in a content-neutral and viewpoint-neutral fashion, there can be no serious First Amendment objection. *See, e.g.*, *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 809-10 (1984); *Schneider v. State*, 308 U.S. 147, 160-61 (1939).