BROWN, Circuit Judge,
with whom HENDERSON, Circuit Judge, joins, dissenting from the denial of rehearing en banc:
The French say: plus qa change et plus c’est la meme chose. The more things change; the more they remain the same. There was once a time when the church was the state and the church as the state embodied all hope of human well-being. R.W. Southern, Western Society and the Church in the Middle Ages 23 (1970). To challenge the church was to undermine civilization. Thus, the imposition of orthodoxy was deemed necessary, and dissent, which amounted to heresy, was met with coercion and violence. See St. Thomas Aquinas, Summa Theologios pt.' II — II, q.ll, art. 3.
This history prompted John Locke to urge toleration and stress the necessity of distinguishing “the business of civil government from that of religion” and establishing clear boundaries between them. John Locke, A Letter Concerning Toleration, reprinted in 5 The Works of John Locke 5, 9 (12th ed.1824). The Framers went further, establishing not only a limited government, but recognizing the primacy of individual conscience and seeking the line between freedom and justice. Thus, the Bill of Rights “grew in soil which also produced a philosophy that ... liberty was attainable through mere absence of governmental restraints, and that government should be entrusted with few controls and only the mildest supervision over men’s affairs.” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 639-40, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The federal government was given no authority over men’s souls. For the Founders, the not-so-distant history of persecution *5 engendered a fierce commitment to each individuars natural and inalienable right to believe according to his “conviction and conscience” and to exercise his religion “as these may dictate.” James Madison, Memorial and Remonstrance Against Religious Assessments, reprinted in 2 Writings of James Madison 183, 184 (G. Hunt ed.1901). “If there is any fixed star in our Constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.” Barnette, 319 U.S. at 642, 63 S.Ct. 1178.
Of course, the right to freely exercise one’s religion is not — and was not intended to be — absolute. The Founders recognized state coercion would at times be necessary, with Madison himself stating “full and free exercise .. .• according to the dictates of conscience” could be limited where “the preservation of equal liberty ... and the existence of the [government] may be manifestly endangered.” G. Hunt, Madison and Religious Liberty, 1 Annual Report of the American Historical Association, H.R. Doc. No. 702, 57th Cong., 1st Sess., 163, 166-67 (1901). However, “[t]he essence of all that has been said and written on the subject is that only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion.” Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).
The soil of the eighteenth century has eroded and that fixed star grown surprisingly dim. We live in a time where progress is sought “through expanded and strengthened governmental controls.” Barnette, 319 U.S. at 640, 63 S.Ct. 1178. In a sense the government now fills the role formerly occupied by the church, embodying the hope of human well-being. For the government to pursue the good and to solve society’s problems, it must first identify that which is good and that which is problematic through subjective and value-laden judgments. Cf. Laurence H. Tribe, Disentangling Symmetries: Speech, Association, Parenthood, 28 Pepp. L.Rev. 641, 651-53 (2001) (stating that when the government takes a side in a “direct clash of competing images of ‘the good life,’ ” it “is making an intrinsically contestable statement about the rightness or wrongness” of ideals). Consequently, orthodoxy has been rehabilitated, and dissent from the government’s determinations may be quelled through coercion — onerous fines or banishment from commerce and the public square.
Despite the parallels, we do not find ourselves full circle quite yet. Religious adherents may still seek refuge from unnecessary governmental coercion through the Religious Freedom Restoration Act (“RFRA”). When the federal government substantially burdens free exercise, it may do so only in pursuit of a compelling interest and even then must use the least restrictive means. 42 U.S.C. § 2000bb-1. Further, the conscience of the individual remains protected in that he must “answer to no man for the verity of his religious views.” United States v. Ballard, 322 U.S. 78, 87, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). But, in our respectful vieWj the panel in this case failed to apply these protections. The panel conceded Plaintiffs sincerely “believe that the regulatory framework makes them complicit in the provision of contraception,” Op., 772 F.3d 229, 247 (quoting Mich. Catholic Conf. v. Burwell, 755 F.3d 372, 385 (6th Cir.2014), vacated and remanded, — U.S. -, 135 S.Ct. 1914, 191 L.Ed.2d 760 (2015)). That acknowledgement should end our inquiry into the substance of their beliefs. Viewed objectively, Plaintiffs’ belief that the acts the regulations compel them to perform *6 would facilitate access to contraception in a manner that violates the teachings of their Church may “seem incredible, if not preposterous,” to some people. Ballard, 322 U.S. at 87, 64 S.Ct. 882. However, this Court is neither qualified nor authorized to so scrutinize any religious belief. The panel trespassed into an area of inquiry Supreme Court precedent forecloses. It then proceeded to accept evidence that is insufficient under the rulings of the Supreme Court to find the purported compelling interest. For these reasons we believe this exceptionally important case is worthy of en banc review.
I
We begin by addressing the panel’s opening observations and by making some of our own with the hopes of distinguishing between fact and fancy. First, this case is not about denying any woman access to contraception. A woman’s right to obtain and use contraception was recognized long ago, and nothing about this case calls for the issue to be revisited. See Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).
Second, this case is about the religious freedom of these religiously-affiliated organizations and not about the free exercise concerns of the plaintiffs in Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). In that case, the Supreme Court found the Department of Health and Human Services’ (“HHS”) approach to religious nonprofits demonstrated there were less restrictive means available to deal with conscientious objectors among for-profit corporations. Id. at 2781-82. The Court expressly reserved judgment on whether HHS’s approach “complies with RFRA for purposes of all religious claims.” Id. at 2782. While the government’s approach to religious non-profits may — or may not — fully put to rest the Hobby Lobby plaintiffs’ religious objections, that is irrelevant to our consideration of the religious objections put forth by Plaintiffs in this case. The present Plaintiffs are entitled to their own personal beliefs.
Third, this case is not “paradoxical” because Plaintiffs object to regulatory requirements the government intended as a religious accommodation. Op., 772 F.3d at 246 (quoting Univ. of Notre Dame v. Sebelius, 743 F.3d 547, 557 (7th Cir.2014), vacated and remanded, — U.S. -, 135 S.Ct. 1528, 191 L.Ed.2d 557 (2015)). That the government’s expressed intent in enacting the regulations at issue was to allay religious adherents’ concerns about the contraception mandate is not determinative of the ultimate question of whether Plaintiffs were in fact accommodated. Where the government imposes a substantial burden on religious exercise and labels it an “accommodation,” that burden is surely as distressing to adherents as it would be if imposed without such a designation. Therefore, heightened skepticism is not appropriate. We should look at Plaintiffs’ claims as we would any RFRA claim. After all, in the substantial burden analysis, the government’s motivations— no matter how benevolent — are irrelevant; we ask only whether the government’s action operates to place “substantial pressure on an adherent to modify his behavior and to violate his beliefs.” Thomas v. Review Bd., 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).
Fourth, this case is not one in which Plaintiffs’ “only harm ... is that they sincerely feel aggrieved by their inability to prevent what other people would do to fulfill regulatory objectives after they opt out.” Op., 772 F.3d at 246. The regulations compel Plaintiffs to take actions they believe would amount to “impermissibly *7 facilitating access to abortion-inducing products, contraceptives, and sterilization” in violation of their religious tenets. Pet. for Reh’g En Banc at 1. Make no mistake: the harm Plaintiffs complain of — and the harm this Court therefore is called to assess — is from their inability to conform their own actions and inactions to their religious beliefs without facing massive penalties from the government.
II
The panel’s substantial burden analysis is inconsistent with the precedent of the Supreme Court and this Court, which identifies both permissible and impermissible lines of inquiry in the substantial burden analysis of a RFRA claim.
A
As we have recognized, whether a burden is “substantial” for purposes of RFRA is a question of law for the court to answer, not a “question[ ] of fact, proven by the credibility of the claimant.” Mahoney v. Doe,, 642 F.3d 1112, 1121 (D.C.Cir.2011). Relying on longstanding precedent, the Supreme Court recently described permissible lines of inquiry for a court to pursue in determining whether an adherent’s religious exercise has been substantially burdened, both in Hobby Lobby and in Holt v. Hobbs, — U.S. -, 135 S.Ct. 853, 190 L.Ed.2d 747 (2015), a case involving the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq, (RLUIPA).[1] The plaintiff bears “the initial burden of proving [the law or regulation at issue] implicates his religious exercise.” Holt, 135 S.Ct. at 862. While RFRA forecloses asking whether the exercise is “compelled by, or central to, a system of religious belief,” 42 U.S.C: § 2000cc-5(7)(A), the court does ask whether the plaintiffs beliefs are sincere. The answer is no if his claims are not “sincerely based on a religious belief’ but instead on “some other motivation.” Holt, 135 S.Ct. at 862; see also Hobby Lobby, 134 S.Ct. at 2774 n. 28 (“To qualify for RFRA’s protection, an asserted belief must be ‘sincere.’ ”).
Next, the plaintiff bears the “burden of proving that the [law or regulation] substantially burden[s] that exercise of religion.” Holt, 135 S.Ct. at 862. The court asks whether he has been “put[ ] to th[e] choice” of either “ ‘engaging] in conduct that seriously violates [his] religious beliefs’” or facing “serious” consequences. Id. (quoting Hobby Lobby, 134 S.Ct. at 2775); see also Thomas, 450 U.S. at 718, 101 S.Ct. 1425 (stating a substantial burden exists when the government places “substantial pressure on an adherent to modify his behavior and to violate his beliefs”). The answer is no if the plaintiff can identify “no [compelled] action or forbearance on his part.” Kaemmerling v. Lappin, 553 F.3d 669, 679 (D.C.Cir.2008) (plaintiff objecting to the government’s extraction of DNA information from fluid or tissue samples but not to providing DNA samples); see also Bowen v. Roy, 476 U.S. 693, 699-700, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (plaintiff objecting to the government’s independent utilization of his daughter’s social security number, which he himself was not required to provide or use). The answer is also no where the pressure being placed upon a person to act contrary to his beliefs or the consequences *8 he faces for not doing so are not substantial. See Thomas, 450 U.S. at 717, 101 S.Ct. 1425 (assessing the “coercive impact” of being “put to a choice between fidelity to religious belief or cessation of work”). Finally, this Court has “inquir[ed] into the importance of a religious practice” to the individual. Henderson v. Kennedy, 265 F.3d 1072, 1074 (D.C.Cir.2001) (denying rehearing en banc). In doing so, we have found no substantial burden exists where a regulation is “at most a restriction on one of a multitude of means” for an individual to engage in his desired religious exercise. Henderson v. Kennedy, 253 F.3d 12, 17 (D.C.Cir.2001) (the plaintiffs could spread the gospel any number of ways, just not the prohibited means of selling t-shirts on the National Mall); see also Mahoney, 642 F.3d at 1120-21 (the plaintiff had ample alternative means of spreading his religious message besides chalking the sidewalk in front of the White House).[2]
Here, Plaintiffs’ faith compels them to provide their employees and students with health insurance plans. Oral Arg. Tr..at 19:5-15. Their religious beliefs forbid them not only from providing or paying for contraception, but also from facilitating its provision. Pis. Br.' at 15. Plaintiffs therefore believe they exercise their religion by providing health insurance plans that do not facilitate access to contraception. Id. at 11-12, 15, 24-25. In determining whether an act constitutes impermissible 'facilitation Plaintiffs are informed by “the Catholic doctrines of material cooperation and scandal.” Id. at 36. The sincerity of Plaintiffs’ beliefs has not been questioned. Op., 772 F.3d at 246-47.
Plaintiffs identify at least two acts that the regulations compel them to perform that they believe would violate their religious obligations: (1) “hiring or maintaining a contractual relationship with any company required, authorized, or incentiv-ized to provide contraceptive coverage to beneficiaries enrolled in Plaintiffs’ health plans,” Pet. for Reh’g En Banc at 3; and (2) “filing the self-certification or notifica-' tion,” id. at 4. Plaintiffs have therefore shown both that they are being compelled to modify their behavior and that, if undertaken, the modification would be a violation of their religious beliefs. They are unlike the plaintiffs in Kaemmerling and Bowen, as they have shown they are themselves being compelled to modify their behavior.
If Plaintiffs do not act in violation of their beliefs, however, they face two alternatives. First, they may offer coverage that does not include contraceptives and face onerous fines. 26 U.S.C. § 4980D(b)(l). Alternatively, they may stop providing health insurance altogether, which would also be a violation of their religious beliefs. Oral Arg. Tr. at 19:5-15. Imposing such harsh consequences certainly substantially pressures Plaintiffs to alter their behavior in a way inconsistent with their religious beliefs. See Hobby Lobby, 134 S.Ct. at 2759 (stating if “heavy” financial penalties “do not amount to a substantial burden, it is hard to see what would”). Plaintiffs have therefore demonstrated their free exercise is substantially burdened: they are being “put[] to [the] choice” of either “ ‘engaging] in conduct that seriously violates [their sincere] religious beliefs’ ” or facing “serious” consequences. Holt, 135 S.Ct. at 862 (quoting Hobby Lobby, 134 S.Ct. at 2775).
*9 B
The panel’s opinion parts ways with precedent by wading into impermissible lines of inquiry. The panel did not dispute that federal law operates to compel Plaintiffs to maintain a relationship with an issuer or TPA that will provide the contraceptive coverage and to execute the self-certification or alternative notice. Their disagreement with Plaintiffs is about the significance of those compelled acts; in other words, the panel rejected the “adherents’ claim about the religious meaning of the undisputed operation of [] federal regulation[s].” Concurring Op. at 2; see also Eternal Word Television Network, Inc. v. Sec’y, Dep’t of Health & Human Servs., 756 F.3d 1339, 1340 (11th Cir.2014) (Pryor, J. specially concurring) (disposing of the argument that the plaintiffs complaint should “fail[ ] because [the plaintiff] holds an erroneous legal opinion about how the contraception mandate works” because the plaintiff “offer[ed] no evidence that its complaint turns on the advice of counsel” but instead offered “undisputed declarations ... about the ancient teachings of the Catholic Church”). With a thorough analysis of the regulations, the panel determined they “do not compel” Plaintiffs to “provide, pay for, and/or facilitate access to contraception, sterilization, abortion, or related counseling in a manner that violates ' the teachings of the Catholic Church.” Op., 772 F.3d at 246 (quoting Pis.’ Br. at 15). The panel explained the regulations allow Plaintiffs to “wash[ ] their hands of any involvement in providing insurance coverage for contraceptive services.” Id. Therefore, the panel concluded, Plaintiffs have been subjected to only to a de minimis burden of completing a form, and their RFRA claim fails. Id. at 249.
In declaring that — contrary to Catholic Plaintiffs’ contentions — it would be consistent with the teaching of the Catholic Church for Plaintiffs to comply with the regulations the panel exceeded both the “judicial function and [the] judicial competence.” Thomas, 450 U.S. at 716, 101 S.Ct. 1425. What amounts to “facilitating immoral conduct,” Pet. for Reh’g En Banc at 1, “scandal,” id. at 7, and “material” or “impermissible cooperation with evil,” id.; Op., 772 F.3d at 240, are inherently theological questions which objective legal analysis cannot resolve and which “federal courts have no business addressing.” Hobby Lobby, 134 S.Ct. at 2778; see also id. (stating “the circumstances under which it is wrong for a person to perform an act that is innocent in itself but has the effect of enabling or facilitating the commission of an immoral act by another” is “a difficult and important question of religion and moral philosophy”). The causal connection sufficient to create impermissible “facilitation” in the eyes of a religious group may be very different from what constitutes proximate cause in the common law tradition. See Univ. of Notre Dame, 743 F.3d at 566 (Flaum, J., dissenting) (“[W]e are judges, not moral philosophers or theologians; this is not a question of legal causation but of religious faith.”). Likewise, where civil authorities may conclude an individual has “wash[ed his] hands of any involvement,” Op., 772 F.3d at 247, adherents of a faith may examine the same situation and, in their religious judgment, reach the opposite conclusion. Pontius Pilate, too, washed his hands, but perhaps he perceived the stain of complicity remained. See Matthew 27:24.
Under the panel’s analysis, it seems no claim of substantial burden may prevail where the religious significance of conduct under scripture as interpreted by a faith tradition differs from the legal significance of that conduct under the laws of the United States as interpreted by federal judges. But RFRA would be an exceedingly shallow — perhaps nonexistent — pro *10 tection of religious exercise if adherents were only permitted to give the same meaning to their actions or inactions as does the secular law.
Plaintiffs, including an Archbishop and two Catholic institutions of higher learning, say compliance with the regulations would facilitate access to contraception in violation of the teachings of the Catholic Church. What law or precedent grants this Court authority to conduct an independent inquiry into the correctness of this belief? Instead, where one sincerely believes performing certain acts would cause him to cross the line between permissible behavior and sin, the Supreme Court has instructed, “it is not for us to say that the line he drew was an unreasonable one.” Hobby Lobby, 134 S.Ct. at 2778 (quoting Thomas, 450 U.S. at 715, 101 S.Ct. 1425). Plaintiffs’ sincere determination about the obligations their religion imposes is between them and their God and need not be “acceptable, logical, consistent, or comprehensible to others in order to merit ... protection.” Thomas, 450 U.S. at 714, 101 S.Ct. 1425. This is so even when, in the government’s opinion, Plaintiffs’ determination is based on a misunderstanding of the nature of their legal obligations, their religious obligations, or both — as the two could certainly overlap.[3] RFRA’s concern is with the sincerity of religious beliefs and not their accuracy. For example in United States v. Lee, Mr. Lee claimed he could not pay social security taxes without violating an obligation under his Amish faith to care for fellow church members. 455 U.S. 252, 257, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). The Supreme Court refused to consider the government’s argument that paying social security taxes did not actually interfere with exercise of this belief, as the Amish would remain free to care for their own community if they paid social security taxes but did not collect benefits. Id. Instead the Court simply accepted Mr. Lee’s “contention that both payment and receipt of social security benefits is forbidden by the Amish faith,” explaining “[cjourts are not arbiters of scriptural interpretation.” Id. (quoting Thomas, 450 U.S. at 716, 101 S.Ct. 1425).
The panel’s analysis further parts ways with precedent by recasting Plaintiffs’ objection to the facilitation of access as an *11 objection to the conduct of third parties. Op., 772 F.3d at 250-51. The panel relied on Bowen and Kaemmerling to find Plaintiffs may not object “to the role of [their] action in the broader regulatory scheme.” Op., 772 F.3d at 251. There are two problems with this analysis. First, in this case the government is requiring Plaintiffs to perform objectionable acts. In contrast, the Bowen and Kaemmerling plaintiffs’ objections were to the government’s actions. See Bowen, 476 U.S. at 699-700, 106 S.Ct. 2147; Kaemmerling, 553 F.3d at 678. The claims in Bowen and Kaemmer-ling are different in kind from a claim that the government is compelling the individual himself to undertake actions he believes are sinful.
Second, the .actions to which Plaintiffs object — which may seem innocent if examined devoid of context — must be understood in light of the broader regulatory scheme. When the Supreme Court has considered claims involving beliefs about facilitation of immoral conduct, it has not employed the panel’s approach of requiring the adherent to view their own actions in isolation. Instead the Court found a substantial burden where the plaintiffs were compelled to take actions they believed to be impermissible based on the actions’ place in a chain of events. See, e.g., Hobby Lobby, 134 S.Ct. at 2759 (the plaintiffs objected to providing access to abortifacients because others’ use of the drugs may result in the destruction of a human embryo); Thomas, 450 U.S. at 710, 101 S.Ct. 1425 (plaintiff objected to fabricating turrets because those turrets would then be affixed by others to military tanks and used by others in warfare). This makes good sense, as the concept of facilitation inherently involves a view of one’s conduct in relation to that of others’. Logic and precedent therefore compel us to permit persons to object to performing an act that would be itself innocent but for its illicit consequences. Plaintiffs object to maintaining a relationship with an issuer or third-party administrator (“TPA”) that will use Plaintiffs’ health insurance plans as vehicles to provide contraceptive coverage. They object to completing, as the panel describes it, an “opt-out mechanism that shifts to third parties the obligation to provide contraceptive coverage.” Op., 772 F.3d at 252. Such claims do not fall outside the purview of RFRA.
Ill
As Plaintiffs have demonstrated a substantial burden on their free exercise, the government may only prevail by demonstrating the regulations further a compelling interest and employ the least restrictive means of doing so. 42 U.S.C. § 2000bb-1. A compelling interest is an interest “of the highest order.” Yoder, 406 U.S. at 215, 92 S.Ct. 1526. To satisfy strict scrutiny, the government must “specifically identify an actual problem in need of solving” and the burden on free exercise “must be actually necessary to the solution.” Brown v. Entm’t Merchs. Ass’n, — U.S. -, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011) (internal citations and quotations omitted). The panel found the government demonstrated a compelling interest in “seamless provision of contraceptive services.” Op., 772 F.3d at 258. The panel then rejected any less restrictive means of providing contraceptive coverage without cost sharing that would require women to complete additional steps to obtain the coverage, explaining such means “make the coverage no longer seamless from the beneficiaries’ perspective.” Id. at 249.
Even assuming for the sake of argument that the government possesses a compelling interest in the provision of contraceptive coverage without cost sharing, it has not succeeded in demonstrating a compel *12 ling interest in the “seamless” provision of coverage. The government has pointed to no evidence in the record demonstrating its purported interest in providing contraceptive coverage without cost-sharing is harmed when women must undergo additional administrative steps to receive the coverage. The government cites only to one page in the Federal Register to support the proposition that coverage must be provided seamlessly.[4] Gov’t Supp. Br. at 20 (citing 78 Fed.Reg. 89,870, 39,888 (Jul. 2, 2013)). This page provides no evidence that a procedure under which individuals must take additional steps to receive contraceptive coverage poses a “problem in need of solving,” but instead offers only conclusory and unsubstantiated statements that surely cannot be sufficient for the government to meet its burden in strict scrutiny analysis. That “additional steps” would be so burdensome as to hinder women’s access to contraception is pure speculation. For example; if all that was required was that the employee or student fills out a “simple, one-step form,” that would be a “de minimis requirement” to which we assume the panel would have no objection. Op., 772 F.3d at 246-47, 249; see also Roman Catholic Archdiocese of New York v. Sebelius, 987 F.Supp.2d 232, 256 (E.D.N.Y.2013) (“If these steps only entail filling out a form, it seems that the burden of filling out that form should fall on those who have no religious objection to doing so.”).
Further, the government cannot meet its burden of demonstrating a compelling interest where it leaves “appreciable damage to [the] supposedly vital interest un-prohibited.” Church of the Lukumi Ba-balu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (quoting Fla. Star v. B.J.F., 491 U.S. 524, 542, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring)); see also Republican Party of Minn. v. White, 536 U.S. 765, 780, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (stating a law’s purpose is undermined when it is “so woefully underinclusive as to render belief in [its] purpose a challenge to the credulous”). As the panel notes, the Affordable Care Act permits employers to “ceas[e] to offer health insurance as an employment benefit, and instead pay[ ] the shared responsibility assessment and leav[e] the employees to obtain subsidized health care coverage on an insurance exchange.” Op., 772 F.3d at 245. While Plaintiffs state they cannot exercise this option without violating their religious obligations, Oral Arg. Tr. at 19:5-15, the panel nevertheless reminds them it would be acceptable under the law. Op., 772 F.3d at 245. The untold many whose employers provide no health insurance and instead pay the assessment must face “logistical, informational, and administrative burdens,” id. at 265, in arranging for subsidized coverage on a health insurance exchange. They must “take steps to learn about, and to sign up for,” 78 Fed.Reg. at 39,888, health insurance on their own. The government simply cannot argue with a straight face that women who gain access to contraceptive coverage by identifying and signing up for a subsidized health insurance plan on a government exchange receive that coverage “seamlessly.” Cf. Hobby Lobby, 134 S.Ct. at 2783. Therefore, in leaving “appreciable damage” to its “supposedly vital interest” in seamless *13 provision of contraceptive coverage, the government’s regulations cannot survive strict scrutiny. Church of the Lukumi Babalu, Aye, 508 U.S. at 547, 113 S.Ct. 2217 (quoting Fla. Star, 491 U.S. at 542, 109 S.Ct. 2603 (Scalia, J., concurring)).
The question of least restrictive means then becomes the other side of the same coin. The government could treat employees whose employers do not provide complete coverage for religious reasons the same as it does employees whose employers provide no coverage. This would entail providing for subsidized — or in this case free — contraceptive coverage to be made available on health care exchanges. An employee of a religious objector then would face the same administrative burdens as those who find complete coverage — including contraceptive services coverage — on the exchanges. However, just like others who use the exchanges,- after overcoming these administrative hurdles, employees of religious objectors would have contraceptive coverage without cost sharing. Such a mechanism would therefore be effective and would minimize the burden on religious adherents, demonstrating its viability as a less restrictive means than the current regulations.
IV
The Supreme Court has interpreted the First Amendment to deprive individuals of constitutional protection against neutral laws — meaning almost any law where the government does not announce its intention “to infringe upon or restrict practices because of their religious motivation.” Church of the Lukumi Babalu Aye, 508 U.S. at 533, 113 S.Ct. 2217. Genuine neutrality, however, would “allow[ ] many different and contending voices to be represented in public discourse.” Michael W. McConnell, Why is Religious Liberty the “First Freedom”?, 21 Cardozo L.Rev. 1243, 1262 (2000). When the state quells disparate voices, declaring a winner on one side of the culture wars, neutrality becomes a proxy for majoritarianism and secularism. Id.
Priests for Life is an organization that exists solely for the purpose of countering the benign narrative that contraception and abortion are beneficial to women. The other Plaintiffs exist, at least in part, to engender a counter-cultural narrative that “life begins at the moment of conception ... and that certain ‘preventative’ services that interfere with conception or terminate a pregnancy are immoral.” Pis. Br. at 15. Those who accept employment with these organizations and students who enroll at these schools do so with full awareness of their mediating stance. Nevertheless, though the government acknowledges that a primary goal of such organizations is to oppose the government’s mission of increasing access to and use of contraception, it places them outside its grudging religious exemption and offers only one real choice — they can renounce their religious scruples overtly or in practical effect. If the government coopts their contractors and administrative structures to dispense advice, drugs, and services that contravene their religious views, in effect, it has written contraceptive care, including access to abortifacients, into Plaintiffs’ employment contracts and student health care agreements. Commandeering is not accommodation, and, in this context, “seamlessness” is just shorthand for surrender.
The French have another saying, mocking the Bourbon restoration: Us n’ont ríen appris, ni ríen oublié. Learning nothing and forgetting nothing. The modern maxim does the Bourbon monarchs one better: learning nothing and forgetting everything. Alas, preserving the fragile ark of our constitutionalism requires us to remember that the first principle of liberty is *14 freedom from gratuitous coercion. We respectfully dissent.

. RLUIPA "targets two areas of state and local action: land use regulation, 42 U.S.C. § 2000cc (RLUIPA § 2), and restrictions on the religious exercise of institutionalized persons, § 2000cc-l (RLUIPA § 3).” Sossamon v. Texas, 563 U.S. 277, 131 S.Ct. 1651, 1656, 179 L.Ed.2d 700 (2011). It "borrows important elements from RFRA ... but is less sweeping in scope.” Id.

. While the propriety of this sort of inquiry in pure free exercise cases is arguably called into question by recent Supreme Court precedent, see Holt, 135 S.Ct. at 862, it is not relevant to this case. That the practice Plaintiffs defend here is of sufficient importance to them to form the basis of a substantial burden under RFRA has not been questioned.

. Confusion remains as to the legal obligations the regulations impose on third party administrators (“TPAs”). In Wheaton College v. Burwell, Justice Sotomayor explained a TPA does not have an independent obligation but instead “bears the legal obligation to provide contraceptive coverage only upon receipt of a valid self-certification.” - U.S. -, 134 S.Ct. 2806, 2814 n. 6, 189 L.Ed.2d 856 (2014) (Sotomayor, J., dissenting) (citing 26 C.F.R. § 54.9815-2713A(b)(2) (2013); 29 C.F.R. § 2510.3-16(b) (2013)). Even evaluating the new regulations as supplemented in light of the Supreme Court’s ruling in Wheaton College, die panel did not identify any scenario under which a TPA is obligated to provide contraceptive coverage until the TPA is designated a "plan administrator” for purposes of ERISA. Op., 772 F.3d at 254-55. As the regulations currently stand, this designation occurs only after a religious nonprofit has either completed the self-certification form or the alternative notice and after the TPA agrees to enter into or remain in a contractual relationship with the nonprofit organization. See 26 C.F.R. § 54.9815-2713AT(b)(2) (2014) (“If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor [sent after the religious nonprofit provides notice of its objection to the Department] ... and agrees to enter into or remain in a contractual relationship with the eligible organization ... the third party administrator shall provide or arrange for payments of contraceptive services ....”) (emphasis added). If the panel relied on a mistaken assumption about the regulations imposing an independent obligation on TPAs to provide contraceptive coverage, rehearing en banc is all the more warranted.

. The government also references pages of a 2011 Institute of Medicine Report entitled, "Clinical Preventative Services for Women: Closing the Gaps.” Gov't Supp. Br. at 20 (citing pages 103-07). These pages of the report discuss benefits of contraceptive services- and do not reference, much less weigh, the comparative advantage or disadvantage of procedures for accessing those services.